# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-KA-01439-SCT

*MICHAEL HENRY HEARN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/08/2007 |
| TRIAL JUDGE: | HON. DAVID MICHAEL ISHEE |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PHILLIP BROADHEAD |
| | LESLIE S. LEE |
| | DAN W. DUGGAN, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF ATTORNEY GENERAL |
| | BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/11/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., EASLEY AND CARLSON, JJ.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Michael Henry Hearn was convicted on two counts of intimidating a judge. After due consideration, we find no error and affirm his conviction and sentence.

## FACTS

¶2.    In 1993, Judge Larry E. Roberts, then serving as a judge for the Circuit Court of Lauderdale County,[1] was randomly assigned a case involving charges of aggravated assault

---

[1] Since January 2006, Judge Roberts has served as a member of the Mississippi Court of Appeals.

against Michael Henry Hearn. Hearn was convicted and sentenced to the maximum twenty years, with one year suspended and five years probation. The Mississippi Court of Appeals affirmed his conviction and sentence. Hearn filed a petition for post-conviction relief in which he challenged, among other things, the legality of his sentence. The Mississippi Supreme Court reversed Hearn's sentence, finding that he was not eligible for a suspended sentence and should have been required to serve the full twenty years.

¶3. Around the same time that he filed for post-conviction relief, Hearn began frequently writing letters to Judge Roberts. Judge Roberts estimated that he received between fifty and one hundred letters from Hearn, often as many as two or three letters per week. These letters were mostly incoherent, and laden with obscene language and biblical references. Roberts initially read the letters, but began filing them away once they became redundant.

¶4. Hearn mailed a string of similar letters to Judge Robert Bailey, who served alongside Judge Roberts as a circuit judge for Lauderdale County.[2] Judge Bailey's only contact with Hearn occurred in November 1992, when he substituted for Judge Roberts at a plea hearing on drug-related charges against Hearn. At this plea hearing, Judge Bailey simply allowed Hearn to withdraw his guilty plea and signed an order resetting the case for trial. Aside from this one occasion, Judge Bailey had no further involvement in the matter. In January 1993, Judge Roberts signed a *nolle prosequi* on these charges.

¶5. Neither Judge Roberts nor Judge Bailey gave much consideration to Hearn's letters prior to August 2004. At that time, Judge Roberts received a disturbing letter from Dr. Tom

---

[2] Judge Bailey testified that he received more than ten letters.

Moore, a psychologist at East Mississippi Correctional Facility. Dr. Moore informed Judge Roberts as follows:

> I was instructed to evaluate [Hearn's] mental status following repeated threats to harm (kill) [Judge Roberts and Judge Bailey] who sentenced him on 01/04/94 for 20 years for aggravated assault. . . . His release date is 12/26/05, after which he asserts that he plans to carry out his threats to harm.
>
> I met with [Hearn] on 7/29/04 for approximately one hour. During that initial session he reported that he would carry out his threats to harm the two judges whom he feels unjustly incarcerated him for "the stabbing incident . . . where I was just trying to defend myself." The inmate perceives that he is ". . justified, "out of love . . ," [sic] to correct the injustice. He is willing ("eager") to risk incarceration again to complete his goal. On 8/13/04 the inmate approached the undersigned in the hall to question whether this letter was sent to the two judges. He again verbalized vehemently his intentions to do harm.
>
> . . . .
>
> The medical and mental health personnel have mixed judgments regarding whether the inmate is serious about following through with his intentions to harm. There is a consensus, however, that he is more than capable of causing harm.
>
> There is enough evidence based upon diagnosis and presenting behaviors that the inmate presents a threat to the judges in question. . . .

¶6. In addition to Dr. Moore's letter, Judge Roberts received a visit from Arthur Lee Nored, who was a member of the Mississippi State Parole Board at the time. Nored informed Judge Roberts about threatening comments made by Hearn at his recent parole hearing. When asked what he would like to do in society should he be paroled, Hearn said that he had been falsely imprisoned and would "take care of" or "take out" the judges who placed him in the penitentiary. Hearn specifically referenced Judge Roberts. Nored explained that "[b]ased on the on the tempo of the conversation . . . I think it was undeniable that it was a physical threat toward Judge Roberts as well as Judge Bailey and [District Attorney Bilbo

3

Mitchell]." On September 8, 2004, Judge Roberts and Judge Bailey sent a letter to Christopher Epps, the Commissioner of the Mississippi Department of Corrections (MDOC).[3] The judges sought an explanation as to why Hearn was scheduled for early release in December 2005, and requested that they receive thirty days' notice prior to Hearn's release. The judges further requested that MDOC institute involuntary commitment proceedings against Hearn upon his release. Commissioner Epps responded that Hearn's sentence computation was based upon the applicable law at the time. He further stated that instructions had been given that both judges were to receive written notice thirty days prior to Hearn's release. Commissioner Epps, however, did not believe it was proper for MDOC to initiate commitment proceedings.

¶7.     On April 1, 2005, Hearn was indicted in the Lauderdale County Circuit Court on two counts of intimidating a judge pursuant to Mississippi Code Annotated Section 97-9-55 (Rev. 2006). Because of Hearn's status as a habitual offender,[4] the State sought an enhanced sentence of life without the possibility of parole. Judge Roberts and Judge Bailey recused themselves from the case, and Judge T. Kenneth Griffis of the Mississippi Court of Appeals was appointed special judge to preside over the trial. Judge Griffis later recused himself, and Judge David M. Ishee of the Mississippi Court of Appeals was appointed special judge in his stead. Attorney Gary B. Jones was appointed to serve as Hearn's counsel, but withdrew,

---

[3] The record also contains a letter from State Representative Greg Snowden to Commissioner Epps requesting that Commissioner Epps give close attention to this "potentially grave situation."

[4] In addition to the aforementioned conviction for aggravated assault, Hearn was sentenced in the Circuit Court of Oktibbeha County on April 16, 1979, to six years for the sale of marijuana.

4

citing a conflict of interest. Attorney Dan. W. Duggan, Jr., was substituted as Hearn's counsel.

¶8. On September 28, 2005, Hearn filed a motion for mental examination, and the trial court ordered that Hearn undergo a mental evaluation by Dr. Mark Webb. Hearn refused to cooperate with the examination, and his appointment with Dr. Webb was cancelled. Nevertheless, on November 17, 2005, Hearn filed a notice of intent to assert an insanity defense using the findings from Dr. Moore's evaluation at the East Mississippi Correctional Facility. In response, the State filed a motion requesting that Hearn be evaluated by the Mississippi State Hospital at Whitfield to determine his ability to distinguish right from wrong at the time of the crimes and his competency to stand trial. Hearn was eventually evaluated by Drs. John Montgomery, Reb McMichael, and Gilbert McVaugh at the State Hospital on July 11, 2007, just weeks before trial. He was found both competent to stand trial and not legally insane.[5]

¶9. On November 17, 2005, Hearn filed a motion in limine, a motion to dismiss for failure to provide a speedy trial, and a motion to dismiss based on patient/psychiatric privilege violation. The motion in limine sought to prohibit the State from introducing evidence of Hearn's prior convictions, numerous rules violation reports (RVRs) from previous incarcerations, or other prior bad acts. The motion to dismiss for failure to provide a speedy trial was based upon the fact that it had been six months and thirty days since Hearn's arrest and that he had been prejudiced by such delay. In the motion to dismiss based on patient/psychologist privilege violation, Hearn argued that Dr. Moore's statements must be

---

[5] Hearn's mental evaluations are discussed at greater length under Issue I, *infra*.

suppressed because his conversation with Hearn was privileged and confidential pursuant to Rule 503(b) of the Mississippi Rules of Evidence.

¶10.   The circuit court considered the above-referenced motions at a pre-trial hearing on November 21, 2005. The trial judge partially granted the motion in limine by excluding the RVRs and limiting the detail with which the State could go into Hearn's aggravated-assault conviction. The trial court denied Hearn's motion to dismiss for failure to provide a speedy trial and reserved ruling on the motion to dismiss based on patient/psychiatric privilege violation. The trial court never definitively ruled on the admissibility of Dr. Moore's statements, but his testimony was admitted at trial. Hearn also filed several pre-trial motions pro se before this Court, which were denied.[6]

¶11.   The case proceeded to trial on July 23-25, 2007. The morning of trial, Hearn made an ore tenus motion for change of venue, which the trial court denied. He also requested that Duggan be released and that he be appointed new counsel. Hearn was allowed to proceed pro se with Duggan's assistance. At trial, Judge Roberts, Judge Bailey, Dr. Moore, Nored, and Dr. Montgomery testified on behalf of the State. Danny Knight, a special agent with the Mississippi Bureau of Investigation, also testified for the State. Knight said that he had interviewed Dr. Moore, Nored, and both judges, and had reviewed Hearn's letters. He concluded there was "no doubt in my mind that [Hearn] was going to do bodily harm to

---

[6] Hearn filed pro se a: (1) "Motion for a Judgment Pursuant Thru [sic] Article 78 of the Civil Practice Law and Rules"; (2) "Motion for Discretionary Procedure for Allowing Appeal by Pro Se Litigant and Void Double Jeopardy"; (3) "Notice of Motion"; (4) "Motion for Out of Time Appeal"; (5) "Motion for Judgment"; and (6) "Motion for Demands, Trial on Merits, Demand Judgment, Entry of Judgment, and Disposition of Motion, Remedies and Appeals, and Records and Transcripts."

[Judge Roberts and Judge Bailey]." Hearn testified in his own defense that he had not intended to kill or harm Judge Roberts, but only to end his career. He explained that he was focused only on trying to get out of prison.

¶12. The jury found Hearn guilty on two counts of intimidating a judge. As a habitual offender, he was sentenced to life imprisonment without the possibility of parole. Hearn filed a motion for new trial, or in the alternative, judgment notwithstanding the verdict, which the trial court denied.

¶13. Hearn now appeals to this Court raising the following issues: (1) whether the trial court erred by failing to conduct a formal hearing to determine Hearn's competency to stand trial and to represent himself pro se, and whether he was adequately warned about proceeding pro se; (2) whether the trial court erred in admitting Dr. Moore's statements; (3) whether the trial court erred in denying insanity instructions; (4) whether Mississippi Code Annotated Section 97-9-55 (Rev. 2006), as applied to these facts, is unconstitutional under the First and Fourteenth Amendments of the United States Constitution and Article 3, Section 28 of the Mississippi Constitution; (5) whether Hearn's conviction was based upon insufficient evidence or was contrary to the overwhelming weight of the evidence; and (6) whether cumulative error requires reversal.

**DISCUSSION**

I. **Whether the trial court erred by failing to conduct a formal hearing to determine Hearn's competency to stand trial and represent himself pro se, and whether he was adequately warned about proceeding pro se.**

   A. **Competency to stand trial.**

7

¶14. When a trial court determines that a defendant is competent to stand trial, we will not overturn such finding unless it was "manifestly against the overwhelming weight of the evidence." *Martin v. State*, 871 So. 2d 693, 698 (Miss. 2004) (quoting *Emanuel v. State*, 412 So. 2d 1187, 1189 (Miss. 1982)).

¶15. In order to be deemed competent to stand trial, a defendant must be one:

> (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.

*Martin*, 871 So. 2d at 697 (quoting *Howard v. State*, 701 So. 2d 274, 280 (Miss. 1997)). The United States Supreme Court defines the standard for competency to stand trial as being "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States.*, 362 U.S. 402, 402; 80 S. Ct. 788, 788-89; 4 L. Ed. 2d 824, 825 (1960) (per curiam).

¶16. Rule 9.06 of the Uniform Rules of Circuit and County Court Practice provides that:

> If *before or during trial* the court, of its own motion or upon motion of an attorney, has *reasonable ground to believe that the defendant is incompetent to stand trial*, *the court shall order the defendant to submit to a mental examination* by some competent psychiatrist selected by the court in accordance with § 99-13-11 of the Mississippi Code Annotated of 1972.
>
> *After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial*. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant is competent to stand trial. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial.

8

Miss. Unif. Circ. & Cty. R. 9.06 (emphasis added).

¶17.    Prior to trial, the trial court entered three separate orders that Hearn undergo a mental examination to determine his competency to stand trial. Two of these examinations were never completed. On October 5, 2005, pursuant to Hearn's motion, the trial court ordered that Hearn be evaluated by psychiatrist Dr. Mark Webb. Duggan requested this evaluation based on conversations with Hearn and an earlier finding of incompetency in an unrelated matter. In June 1988, staff at the State Hospital at Whitfield found Hearn incompetent to stand trial on two counts of false pretense. This report diagnosed Hearn with "Bipolar Disorder, Manic Type, and Mixed Personality Disorder,"[7] and noted that he had refused treatment. Despite Duggan's efforts, Hearn refused to cooperate, and Duggan was forced to cancel the examination with Dr. Webb. On September 15, 2006, the trial court ordered that Hearn be evaluated by psychologist Dr. Criss Lott.[8] There is nothing in the record to indicate that this examination ever occurred.

¶18.    Even though the October 2005 and the September 2006 orders availed nothing, a third order had been entered in the interim on December 8, 2005. In response to Hearn's notice of insanity defense, the State filed a motion requesting that Hearn be evaluated by the State Hospital to determine his competency to stand trial and his ability to distinguish right from

---

[7]    The June 1988 report described "Bipolar Disorder, Manic Type," as a "major mental disorder characterized by grandiosity and elevation in mood. Persons with this disorder can appear 'high' or manic." The report further explained that "[t]he personality disorder reflects a long-standing pattern of feeling entitled to certain things and feeling that others do not treat him fairly."

[8]    The examination by Dr. Lott was ordered pursuant to a motion filed by one of the parties, but it is not clear which of the parties requested this examination.

9

wrong at the time of the alleged offense. The trial court granted this motion. While the record does not contain a report from this evaluation, Dr. John Montgomery testified that he and two other staff members examined Hearn on July 11, 2007. According to Dr. Montgomery, the panel unanimously concluded that Hearn was competent to stand trial and was not suffering from any mental disorder that would have prevented him from understanding the nature, quality, and wrongfulness of his actions.[9] He stated that Hearn exhibited mild paranoia and wild, extravagant behavior, but did not appear to suffer from any major mood disorders or mental illness.[10] "It was our opinion that most of what we were seeing was due to personality traits rather than ailments," according to Dr. Montgomery. He believed that Hearn used outlandish behavior and comments to emphasize certain points that he was trying to communicate.

---

[9] Hearn initially refused to cooperate with this examination, but eventually agreed to participate only with regard to his competence to stand trial. Hearn would not address his mental state at the time of the alleged offense and would not participate in any psychological tests. Nevertheless, Dr. Montgomery maintained that Hearn's noncooperation did not impede their assessment.

[10] Dr. Montgomery explained that:

[Hearn presented himself] in a dramatic manner and exhibited overly elaborate speech and irrelevant and occasionally tangential thought processes. . . . He would kind of drift off into tangents occasionally talking about things, but he could come back to them. This is sometimes seen in mood disorders. It's a - - called a flight of ideas. And in Mr. Hearn's case, it did not appear that he was suffering from a major mood disorder although we wanted to rule it out.

Dr. Montgomery cited two examples of Hearn's wild behavior. Just prior to his admission to the East Mississippi Correctional Facility, Hearn planned his wife's funeral in great detail, including hiring a singer, writing an obituary, and picking out a casket. He also used a derogatory term when referring to his own mother.

¶19.    We find that the trial court failed to comply in the strictest technical sense with Rule 9.06 which mandates that a competency hearing be conducted following a court-ordered mental examination. Miss. Unif. Circ. & Cty. R. 9.06 ("After the examination the court *shall* conduct a hearing . . . .") (emphasis added).[11] However, Dr. Montgomery testified at trial as to Hearn's competency and was subjected to cross-examination. Because Hearn was afforded the opportunity to present competing evidence, the purposes of Rule 9.06 were satisfied.

¶20.    Certainly, Hearn's eccentric behavior was displayed frequently throughout the course of trial. His efforts to explain portions of the letters to Judge Roberts and Judge Bailey were muddled and incoherent.[12] On one occasion, he stated that Judge Roberts had tried to bribe

_____

[11] This Court has previously addressed a trial court's obligation to conduct a formal competency hearing. ***Howard v. State***, 701 So. 2d 274, 280-84 (Miss. 1997); ***Conner v. State***, 632 So. 2d 1239, 1247-51 (Miss. 1993), *overruled on other grounds*. ***Connor***, however, relied upon former Uniform Circuit Court Rule 4.08, which did not require that a competency hearing be conducted following a court-ordered mental examination. Instead, a competency hearing was required only if there remained "reasonable grounds" to believe that the defendant was insane. ***Connor***, 632 So. 2d at 1248. This determination was within the trial court's discretion. ***Id***. Although ***Howard*** was decided after the enactment of Rule 9.06, it erroneously relied upon the discretionary standard applied in ***Connor***. ***Howard***, 701 So. 2d at 280-84. Because Rule 9.06 now requires a formal competency hearing after a court-ordered mental examination, ***Connor*** and ***Howard*** are no longer instructive with regard to whether or not a competency hearing should be held.

[12] In attempting to explain an artistic drawing in one of the letters, Hearn stated that:

The NA -- the NA -- the backwards N, it's not that I'm dyslexic, but that's why I wanted to look, the backwards N because I wanted to be as mandatory and stationary as possible, but it's not as low as not guilty and not a plea.

When trying to read and/or explain part of another letter, Hearn said that:

Well, being a Baptist, a Christian, I knew some people believe in the afterlife and then some people believe in resurrection or whatever you want to call it,

him and have a "duel" with him.[13] He often delved into irrelevant matters and had trouble communicating succinct, understandable questions. He was argumentative at times, and was frequently warned by the trial judge about his "muttering and carrying on."

¶21. But despite his erratic behavior at times, Hearn also expressed an understanding of the facts and proceedings. The main thrust of his opening statement was that he never intended to threaten anyone. He raised a hearsay objection and pressed witnesses to give examples of direct threats that he had made. Before electing to testify in his own defense, he conferred with Duggan and was thoroughly examined by the trial judge. He was engaged in this exchange and responded positively to each question posed by the judge. He rambled on the stand, but was able to communicate his theory of the case: he began writing the letters because he was aggrieved about his post-conviction appeal and re-sentencing, but never

---

but this is penitentiary after -- after, died after. Judges Robert Walter Bailey, Larry Eugene Roberts; Circuit, Municipal and Justice Court. Compromise and conspire -- oh, shoot. I can't even say it now. Conjuring -- conjuring. There is -- they give you same flesh -- the what? The Gs became flesh, something about front and holographic. But then it has a lot of Bible verses at the bottom of it. . . .

Finally, Hearn explained a portion of another letter as follows:

I read a case where a Judge after he sentenced you, he give you an annual review; and that's how I started writing the Judge letting him know what I'm doing and what type of people I'm dealing with and the conversation they have and what they talk about. We gets to a point -- I didn't know they had this one (indicating). I forgot about this. It got, impregnate self. If there was a homosexual parenthesis which you had been not as low as a lady, boy, man, woman, et cetera -- I mean, et cetera break your clothes dash; then it got boy, man, woman, et cetera. You would be amazed at the conversations you hear when you're locked behind closed doors from door to door.

[13] Hearn said that Judge Roberts had once tried to bribe him by tricking him into taking a plea bargain. Hearn apparently equated a plea bargain with a bribe.

intended to threaten anyone. He explained that any perceived threatening language was simply his manner of speech.[14] According to him, "kill" meant that he wanted to end Judge Roberts' career. He stated that he had never considered hurting Judge Roberts because he had filed too many lawsuits and pressed too many charges against him.[15]

¶22. Hearn references the following exchange as direct evidence of his lack of understanding of the proceedings and the gravity of the sentence he faced:

> BY THE COURT: . . . All right. Is there anything that we need to take up preliminarily before we bring in the jury?
>
> BY DEFENDANT HEARN: Yes, sir. I have another question, please.
>
> BY THE COURT: Yes, Mr. Hearn?
>
> BY DEFENDANT HEARN: At the sentence - the sentence stage about habitual offender, I'm working in Washington[,] D.C. I started in Federal Court.[16] Seem like they're working on trying to get that sentence thing straight, so I wouldn't be a habitual offender. What type of bearing would this have on my case?
>
> BY THE COURT: All right. Mr. Hearn, we will address the sentencing at the end. You are at this point in time presumed innocent, and you are as innocent as you - as I am or anyone else in this courtroom under the law. Only if you are convicted by the jury will they consider a sentence, so we will cross the bridge of sentencing when and if we come to that at this time.

---

[14] Hearn said that he used foul language because that was what he had learned in prison.

[15] Hearn claimed to have filed two lawsuits and brought criminal charges of conspiracy against Judge Roberts.

[16] At trial, Hearn asserted that he had filed a petition for habeas corpus in the "United States Courts of Appeal, Washington D.C." which was under review. He later claimed that he had filed in the United States District Court for the Southern District of Mississippi, but had not received any relief. The actual existence or status of these petitions is unclear. The record does contain an October 9, 2007, order from the United States District Court for the Eastern District of Virginia denying Hearn's request to proceed in forma pauperis.

> BY DEFENDANT HEARN: This is the last question. The sentence that you impose on me, *the maximum sentence I could get on this charge is two years plus a fine.* I have been out of prison over two years. I have been locked up in the County Jail over two years. *I don't understand the technicality or of whatever [sic] is going on between the sentencing thing -*
>
> BY THE COURT: Again, Mr. Hearn, we will address sentencing when and if we come to that phase of the trial. So have a seat, sir, and we will go ahead and proceed at this point.

(Emphasis added).

¶23.    We find that this exchange reveals both misunderstanding and knowledge on Hearn's part. He correctly noted that the statute under which he was charged carried a maximum two-year sentence. Miss. Code Ann. § 97-9-55 (Rev. 2006). Additionally, he recognized his status as a habitual offender and expressed concern as to how this would impact his sentence.

¶24.    We find that Hearn's behavior at trial only reflected Dr. Montgomery's opinion that Hearn was an eccentric character, but not incompetent.

### B.    Proceeding pro se.

¶25.    Hearn argues that he was "forced" to proceed pro se, and that the circuit court failed to provide adequate warnings about the dangers and disadvantages of self-representation, as required under *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), and Uniform Circuit and County Court Rule 8.05. Under the Sixth Amendment of the United States Constitution, a criminal defendant has the right to represent himself only if he knowingly and intelligently chooses to do so. *United States v. Joseph*, 333 F.3d 587, 589-90 (5th Cir. 2003) (citing *Faretta*, 422 U.S. at 833-35). This Court's standard of review on such constitutional issues is de novo. *Hayden v. State*, 972 So. 2d 525, 535-36 (Miss. 2007) (citing *Baker v. State*, 802 So. 2d 77, 80 (Miss. 2001)).

14

¶26.　The colloquy which occurred just before trial is set out below:

BY MR. DUGGAN: . . . I talked to Mr. Hearn just a moment ago, and Mr. Hearn asked me to address the Court on two matters in particular. First of all, he asked me to request the Court that he wished to have a motion for a venue change in this matter, and *the second issue was that he asked me to address the Court that he no longer wished to have me as his attorney in this matter as well.* And I wish to bring both of those matters to the attention of this Court. I have not filed a motion myself on either of those matters because it was just brought to my attention about ten minutes ago. I wish to bring both of those matters to this Court's attention, and I think Mr. Hearn may wish to himself bring those matters to the attention of the Court as well.

BY THE COURT: All right. Mr. Hearn, at this point, if you have anything you'd like to say, we'll go ahead and listen to that.

BY DEFENDANT HEARN: Yes, sir. I have brought this to his attention many of times. *Even the time you told me I should listen* [to] *my attorney, I tried to tell you he's not my attorney.* The date -- that was November 22nd. He hasn't showed me anything. I can't even get him to show me the two letters I supposedly wrote, the Congressman talking about. I have never threatened the Judge. When the Judge -- if I have threatened the Judge, the Judge sentenced me July the 12th, 1999.

BY THE COURT: All right. Well, Mr. Hearn, is there any particular reason other than --

BY DEFENDANT HEARN: Because he -- yes --

BY THE COURT: -- that you want to get rid of Mr. Duggan?

BY DEFENDANT HEARN: *He's not representing me. I don't understand what he doing. He just -- I haven't seen him since November 22nd, 2005.*[17] *It's been over a year. What he been doing to help my trial?*

. . . .

BY MR. DUGGAN: Your Honor, all I would say is if Mr. Hearn is not satisfied with my representation of him, if the Court would care to relieve me

---

[17] According to Duggan's itemized statement of attorney fees and expenses, between November 21, 2005 and July 26, 2007, Hearn called Duggan's office at least five times per week.

of representing him in this matter, I would be happy to sit here as a legal advisor and represent him in that capacity if he wishes to represent himself. I have no problem sitting here and advising him in how to handle this case today, and I would be happy to be his legal advisor and representing him in that capacity.

BY THE COURT: All right. First off, in regard to the change of venue, the Court finds that there has been no sufficient evidence placed forward to warrant a change of venue. There is only some sort of allegation by the Defendant which is completely unfounded by any testimony or any other corroborative evidence; so therefore, that -- and as well as the untimeliness of that motion here on the morning of trial; therefore, the motion for change of venue will be denied. Also, as far --

BY DEFENDANT HEARN: Objection, your Honor. I --

BY THE COURT: Mr. Hearn, don't interrupt me.

BY DEFENDANT HEARN: I --

BY THE COURT: Mr. Hearn, you just need to be quiet and listen for now. *Mr. Hearn, while you are entitled to a lawyer to represent you, a lawyer will not be forced upon you. I will release Mr. Duggan as your attorney. However, Mr. Duggan, I would ask that you stay and give him legal advice at this point in time and guide him in his representation of himself. Now, Mr. Hearn, I'm doing that for your own protection. Obviously you are not an attorney. There may be some things you may need assistance on in representing yourself. But since you do wish to -- I think that you do wish to represent yourself. Is that correct, sir?*

BY DEFENDANT HEARN: *No. I want you to appoint me an attorney.*

BY THE COURT: *Not at this late date, sir. You either have Mr. Duggan or you represent yourself.*

BY DEFENDANT HEARN: Well, I wrote you several times, and the Mississippi Department of Corrections -- I already said they was going to find me an attorney when they first came up with this indictment.

BY THE COURT: All right. *Mr. Hearn, you are entitled to an attorney, but you are not entitled to the attorney of your choice.*

BY DEFENDANT HEARN: No.

16

BY THE COURT: Mr. Hearn, don't interrupt me. We're not going to -- I'm going to tell you right now, Mr. Hearn, we are not going to start this off as any sort of a sideshow. You will conduct yourself in an appropriate manner. This is a court of law. This is the Circuit Court of the State of Mississippi, Lauderdale County; and you will conduct yourself accordingly. Do you understand that, sir?

BY DEFENDANT HEARN: Better than you, sir.

BY THE COURT: All right. *Then I will allow you to dismiss Mr. Duggan as your attorney, but I will request and order that he stay here as your attorney legal advisor [sic] at this time, and I would strongly suggest you heed any advice that he has -- that he gives you at this point.*

(Emphasis added).

¶27. After the jury was empaneled, Duggan introduced himself as representing Hearn but added that the trial judge would explain the situation further. Hearn then introduced himself to the jury and stated that "I'm representing myself really, but we just got this straight earlier before y'all [sic] came in." The trial judge told the jury that:

Mr. Hearn is representing himself on this matter; however, Mr. Duggan has graciously consented to stay here as he was court-appointed to do and give Mr. Hearn advice as an attorney. He will not be representing Mr. Hearn, but he is a legal counsel designed to help an individual representing himself in this matter due to the nature -- the serious nature of the offense.

¶28. Just before the start of trial, the trial judge warned Hearn that he would be held to the same standard as a licensed attorney. Thereafter, Hearn proceeded to represent himself with Duggan's assistance.

¶29. We need not address whether Hearn properly waived counsel or was adequately warned about proceeding pro se because he was never left to his own defense—Duggan functionally remained counsel throughout trial in the form of "hybrid representation." *See Metcalf v. State*, 629 So. 2d 558, 564 (Miss. 1993); *see also U.S. v. Oreye*, 263 F.3d 669,

17

671 (7th Cir. 2001).  Hybrid representation consists of "the participation by an attorney in the conduct of the trial when the defendant is proceeding pro se."  *Metcalf*, 629 So. 2d at 562-563 (citations omitted); *see also* Miss. Const. article 3, § 26 (1890) ("In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both . . . .").  This Court has set forth various factors to consider in determining whether the trial court granted pro se or hybrid representation:

> [T]he defendant's accessibility to counsel; whether and how often he consults with counsel up to the point of the request; the stage of trial at which he requests a participatory role in his defense; the magnitude of the role he desires to assume; whether the trial court encourages immediate and constant accessibility of counsel; and the nature and extent of assistance of counsel which has been provided up to the point of the request, including both substantive and procedural aid.

*Metcalf*, 629 So. 2d at 565.

¶30.    Considering these factors individually, we find this case analogous to other cases in which this Court held that a defendant was not deprived of counsel due to hybrid representation.  Duggan was present at Hearn's counsel table during the entire trial and Hearn consulted with him on several occasions.  *See Dunn v. State*, 693 So. 2d 1333, 1342 (Miss. 1997); *Metcalf*, 629 So. 2d at 565.  Hearn conferred with Duggan during the cross-examination of three witnesses and before he chose to testify in his own defense.  Duggan also provided substantial assistance before trial.  *See Dunn*, 693 So. 2d at 1342.  He filed several pretrial motions and represented Hearn at a pretrial hearing on  November 21, 2005, in which the trial court partially granted a motion in limine.  The trial judge further encouraged the constant accessibility of counsel, and advised Hearn to heed Duggan's advice.  *Dunn*, 693 So. 2d at 1342.

18

¶31.   The primary distinction between this case and our prior opinions is that Hearn assumed a substantial role in his defense from the very beginning of trial. Hearn made the opening statement, raised objections, cross-examined each of the State's witnesses, and testified in his own defense. *Cf. Dunn*, 693 So. 2d at 1342 (defendant spoke in front of the jury only during closing argument and was otherwise content to do nothing); *Metcalf*, 629 So. 2d at 565 (defendant presented opening and closing statements, made one objection, and asked one question on cross-examination of each of the State's witnesses). The trial judge also referred to Duggan as Hearn's "legal advisor," a term commonly used when the defendant clearly has waived his rights and the attorney is expected to play a limited role. *Metcalf*, 629 So. 2d at 562.

¶32.   Notwithstanding Hearn's substantial role in his own defense and the label which the trial judge ascribed to Duggan, it is clear from the record that Duggan was not a casual observer. Duggan largely conducted voir dire. Duggan objected to leading during the direct examination of Judge Roberts; advised Hearn, albeit briefly, during the cross-examinations of Drs. Moore, Nored, and Montgomery; consulted with Hearn before he chose to testify in his own behalf; examined Hearn on the stand; handled jury instructions; presented the closing argument; represented Hearn at sentencing; and filed a notice of appeal. As previously noted, Duggan filed several pre-trial motions, as well.

¶33.   Considering the totality of the circumstances, we find that Hearn was never without the assistance of counsel. Duggan was available throughout the entire trial and participated on several occasions. His role was "not merely that of a skilled bystander, but of a substantive litigator." *Metcalf*, 629 So. 2d at 565. Hearn, having never been fully without

19

the assistance of counsel, cannot now complain about inadequate warnings when he received the best of both worlds—the assistance of counsel while conducting his own defense. *Id*.; *Dunn*, 693 So. 2d at 1342-43. Accordingly, we find that there was no need for a waiver instruction. *Metcalf*, 629 So. 2d at 566.[18]

¶34. Hearn further submits that, even if he were competent to stand trial, he remained incompetent to represent himself and cites the recent United States Supreme Court case of *Indiana v. Edwards*, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008), for support. In *Edwards*, the Supreme Court held that States may insist upon counsel for those competent to stand trial

---

[18] The Fifth Circuit has held that standby counsel does not satisfy the right to counsel under the Sixth Amendment no matter how helpful to the defendant or the court. *United States v. Davis*, 269 F.3d 514, 520 (5th Cir. 2001) (citing *U.S. v. Taylor*, 933 F.2d 307, 312 (5th Cir. 1991)). Yet the Fifth Circuit foresees standby counsel as having a very limited role:

> [T]he roles of standby counsel and full-fledged defense counsel are fundamentally different. The very definition of full-fledged counsel includes the proposition that the counselor, and not the accused, bears the responsibility for the defense; by contrast, the key limitation on standby counsel is that such counsel not be responsible—and not be perceived to be responsible—for the accused's defense . . . . [T]he proper role of standby counsel is quite limited. . . . [S]tandby counsel cannot substantially interfere with any significant tactical decisions, cannot control the questioning of witnesses, and cannot speak in place of the defendant on any matter of importance. . . . [T]he role of standby counsel is more akin to that of an observer, an attorney who attends the trial or other proceeding and who may offer advice, but who does not speak for the defendant or bear responsibility for his defense.

*Taylor*, 933 F.2d at 312-13 (citations omitted).

In the case before us, Duggan exceeded the role of standby counsel as envisioned by the Fifth Circuit. Whatever he may be called, Duggan went beyond the role of mere advisor and spoke for Hearn on matters of importance. We need not be constrained by "the tyranny of labels." *See Oreye*, 263 F.3d at 672. "If the defendant's counsel provides all the assistance required by the Sixth Amendment, the fact that he is called 'standby counsel' would not violate the amendment." *Oreye*, 263 F.3d at 672.

but "who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id*. at 2388. Thus, the Constitution permits states to adopt a higher standard of competency for self-representation. *Id*. But as discussed above, it is unnecessary for us to determine whether Hearn was incompetent to represent himself because he received assistance of counsel through hybrid representation. Therefore, even if we were to adopt a higher standard of competency for self-representation as permitted under *Edwards*, Hearn would not stand to benefit due to the fact that he received hybrid representation.[19]

## II. Whether the trial court erred in admitting Dr. Moore's statements.

¶35. Hearn acknowledges that this assignment of error was not preserved on appeal, but asks this Court to review it under plain error.

¶36. The plain-error doctrine is implicated when an error at trial "affects substantial rights and results in 'a manifest miscarriage of justice.'" *Walker v. State*, 913 So. 2d 198, 216 (Miss. 2005) (citing *Gray v. State*, 549 So. 2d 1316, 1321 (Miss. 1989)). This Court has found plain error in a lower court's failure to properly evaluate evidentiary matters. *Williams*

---

[19] We note that aside from hybrid representation, this case is factually similar to *Edwards*. The *Edwards* defendant received mixed assessments of competency leading up to his trial. *Edwards*, 128 S. Ct. at 2382. He was ultimately diagnosed with schizophrenia and found competent to stand trial, but not competent to represent himself. *Id*. at 2382-383. Here, Hearn had been found incompetent to stand trial in 1988 and was diagnosed with bipolar disorder, which was noted as "a major mental disorder," and mixed personality disorder. In August 2004, Dr. Moore noted Hearn as having a delusional disorder. Dr. Montgomery considered Hearn's history and concluded that Hearn had some mental issues, but none which rose to the level of a "major mental disorder" or him being "psychotic." While Hearn's evaluations are spread out over a greater period of time than those in *Edwards*, both defendants received mixed assessments before trial.

21

*v. State*, 794 So. 2d 181, 188 (Miss. 2001), *overruled on other grounds*, **Brown v. State**, 2008 Miss. LEXIS 586, *9 (Nov. 20, 2008) (citing **Signer v. State**, 536 So. 2d 10, 12 (Miss. 1988)). Plain error is also appropriate where there is a violation of constitutional rights. **Randall v. State**, 806 So. 2d 185, 232 (Miss. 2001) (citations omitted).

### A.     Psychotherapist-patient privilege.

¶37.    Hearn argues that his communications with Dr. Moore were confidential, privileged, and inadmissible. He submits that communications between a patient and a psychiatrist may only be disclosed in the limited circumstances under Mississippi Code Annotated Section 41-21-97 (Rev. 2005) and Title 45 of the Code of Federal Regulations, Section 164.512(j).[20] He contends that Mississippi Rule of Evidence 503 does not provide a future-harm exception to the psychotherapist-patient privilege. Miss. R. Evid. 503.

¶38.    Mississippi Code Annotated Section 73-31-29 (Rev. 2008) broadly states that "[a] psychologist shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment . . . ." Miss. Code Ann. § 73-31-29 (Rev. 2008). Yet, Mississippi Code Annotated Section 41-21-97 (Rev. 2005) provides, in pertinent part, that:

---

[20]    Title 45 of the Code of Federal Regulations, Section 164.512(j), a federal regulation promulgated under the Health Insurance Portability and Accountability Act of 1996, provides standards for the disclosure of protected health information to avert a serious threat to health or safety. 45 CFR 164.512(j). Disclosure is permitted, in pertinent part, when "necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public; and . . . [i]s [made] to a person or persons reasonably able to prevent or lessen the threat, including the target of the threat." 45 CFR 164.512(j)(1)(i)(A)-(B).

> [H]ospital records of and information pertaining to patients at treatment facilities or patients being treated by . . . psychologists . . . shall be confidential and shall be released only . . . when the patient has communicated to the treating . . . psychologist . . . an actual threat of physical violence against a clearly identified or reasonably identifiable potential victim or victims, and then the treating . . . psychologist . . . may communicate the threat only to the potential victim or victims, a law enforcement agency, or the parent or guardian of a minor who is identified as a potential victim.

Miss. Code Ann. § 41-21-97 (Rev. 2005).

¶39. We find that Section 41-21-97 creates an exception to Section 73-31-29 where a patient makes threats of physical violence. In his examination with Dr. Moore, Hearn stated his intent to physically harm Judge Roberts and Judge Bailey. Dr. Moore then communicated this threat to one of the potential victims, Judge Roberts.

¶40. Hearn nevertheless contends that there was no clear, imminent danger because he was not scheduled to be released until December 2005, and there were differing opinions among staff members about the seriousness of his intent to commit the crime. *See **Miss. State Bd. of Psychological Examiners v. Hosford***, 508 So. 2d 1049, 1055 (Miss. 1987) ("[a] psychologist may disclose otherwise confidential information where 'not to do so would result in clear danger to the person or to others.'"). While Dr. Moore noted mixed judgments about Hearn's seriousness in following through with his threats, there was a consensus among staff members that Hearn was capable of causing harm. Although his threats may have materialized only a year later upon his release, we cannot say that the threats were not imminent. At what point should such threats be considered imminent—months, weeks, days, hours, or minutes until Hearn's release? It would be impracticable to require a psychologist to hold such information until some arbitrary future date. There is also the possibility that

23

Hearn could attempt to carry out such threats through an agent prior to his release. Additionally, we must factor in that Hearn's threats didn't merely pose a potential danger to the judges, but constituted crimes in themselves.

¶41. We find Dr. Moore did not violate the psychotherapist-patient privilege by communicating Hearn's threat to Judge Roberts or by testifying at trial. Notwithstanding the exception under Section 41-21-97, Mississippi Rule of Evidence 503 protects only confidential communications which are not intended to be disclosed to third parties. *Everett v. State*, 572 So. 2d 838, 840 (Miss. 1990) (citing Miss. R. Evid. 503). When Dr. Moore told Hearn that he had a duty to warn, Hearn said that he did not care and affirmed his intentions. Weeks later, Hearn asked Dr. Moore in the hallway whether the two judges had been warned. When Dr. Moore said that he had done so, Hearn approved. By intending to disclose his communications to a third party, Hearn waived any and all rights under the psychotherapist-patient privilege. *See Everett*, 572 So. 2d at 840.

**B.** *Miranda* **warnings.**[21]

¶42. Hearn argues that his statements to Dr. Moore also are inadmissible because Dr. Moore failed to provide sufficient *Miranda* warnings. He submits that he had been advised of his rights only four years earlier during the prisoner-intake process.

---

[21] "In *Miranda*, the United States Supreme Court held that the Fifth and Fourteenth Amendments' prohibitions against compelled self-incrimination require that, prior to custodial interrogation, the accused must be advised of his right to remain silent and his right to counsel." *Chim v. State*, 972 So. 2d 601, 603 (Miss. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)).

¶43. We find Hearn's argument to be without merit. The lack of *Miranda* warnings did not render Hearn's statements inadmissible, because the threats constituted a new crime rather than evidence of a prior offense. *United States v. Smith*, 7 F.3d 1164, 1167 (5th Cir. 1993) (citing *United States v. Kirk*, 528 F.2d 1057, 1062 (5th Cir. 1976) ("no fifth amendment problem is presented when a statement is admitted into evidence which is not confessional in nature, but in and of itself constitutes the crime charged").

¶44. For the aforementioned reasons, we find no plain error in the trial court's admission of Dr. Moore's testimony.

### III. Whether the trial court erred in denying insanity instructions.

¶45. The standard for review for the denial of jury instructions provides that:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Chandler v. State*, 946 So. 2d 355, 360 (Miss. 2006) (quoting *Ladnier v. State*, 878 So. 2d 926, 931 (Miss. 2004)).

¶46. Mississippi follows the *M'Naghten* test for determining whether a person was sane at the time of the crime. *Woodham v. State*, 800 So. 2d 1148, 1158 (Miss. 2001) (citing *Russell v. State*, 729 So. 2d 781, 784 (Miss. 1997)); *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843). Under the *M'Naghten* test, the accused must be "'laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing

25

was wrong.'" ***Woodham***, 800 So. 2d at 1158 (quoting ***Roundtree v. State***, 568 So. 2d 1173, 1181 (Miss. 1990)). In sum, the accused must not have known right from wrong at the time of the offense. ***Woodham***, 800 So. 2d 1158 (citing ***Russell***, 729 So. 2d at 784). The question of a defendant's sanity is within the province of the jury, which may accept or reject expert and lay testimony. ***Woodham***, 800 So. 2d at 1158 (citing ***Tyler v. State***, 618 So. 2d 1306, 1309 (Miss. 1993)).

¶47.   A defendant is presumed sane until a reasonable doubt of sanity is created. ***Roundtree***, 568 So. 2d at 1181 (quoting ***Davis v. State***, 551 So. 2d 165, 173 (Miss. 1989)). Once a reasonable doubt of sanity is raised, the State bears the burden to prove the defendant's sanity beyond a reasonable doubt. ***Roundtree***, 568 So. 2d at 1181 (citing ***Billiot v. State***, 454 So. 2d 445, 463 (Miss. 1984), *cert. denied*, 469 U.S. 1230, 105 S. Ct. 1232, 84 L. Ed. 2d 369 (1985)).

¶48.   In his August 2004 letter to Judge Roberts, Dr. Moore noted that Hearn had been diagnosed with "Delusional Disorder." Dr. Moore explained that this psychiatric disorder "indicates that the inmate demonstrates obsessive negative thinking, layered with anger and rage, triggered by a [sic] ideas of persecution." Dr. Moore also stated that Hearn had been noncompliant with his medication.

¶49.   Although he did not raise an insanity defense at trial, Hearn argues that there was substantial evidence to raise a reasonable doubt about his sanity at trial. He submits that his bizarre, irrational behavior, combined with Dr. Moore's reference to Hearn having a "delusional disorder," is sufficient to create a reasonable doubt about his sanity.

¶50. Although Hearn filed a pre-trial notice of insanity defense, he never directly raised such a defense at trial. He even expressed his objection to any psychiatric evaluation the morning before trial. Yet, out of caution, the State called Dr. Montgomery to testify about Hearn's sanity. Dr. Montgomery testified unequivocally that Hearn was able to appreciate the nature, quality, and wrongfulness of his actions. He explained that Hearn had some mental issues, but was not legally insane. When Hearn later proposed the insanity instructions, the State objected that he had never raised the defense at trial. Rather, Hearn's theory of the case was that he did not intend his words as threats. The trial court denied the insanity instructions, but allowed Duggan some leeway to reference Hearn's mental capacity during the closing argument.

¶51. We find that the trial court did not err in denying Hearn's insanity instructions because the evidence was insufficient to create a reasonable doubt of sanity. A trial court may withhold an insanity instruction "'if it concludes that the relationship between a defendant's mental illness history and his criminal conduct has not been explained or examined in any meaningful way.'" *U.S. v. Eff*, 524 F.3d 712, 717 (5th Cir. 2008) (quoting *U.S. v. Dixon*, 185 F.3d 393, 407 (5th Cir. 1999)). Hearn's conduct at trial did not clearly reflect his capacity to know right from wrong at the time of the offense. And even if Dr. Moore's letter was enough to establish that Hearn suffered from a delusional disorder, that fact in itself is insufficient for a rational jury to conclude by clear and convincing evidence that he did not know right from wrong at the time of the offense. *See Eff*, 524 F.3d at 718.

**IV. Whether Mississippi Code Annotated Section 97-9-55 (Rev. 2006), as applied to these facts, is unconstitutional under the First and Fourteenth Amendments of**

**the United States Constitution and Article 3, Section 28 of the Mississippi Constitution.**

¶52. Because Hearn failed to raise this argument in the lower court, the issue is procedurally barred on appeal. *E.g.*, ***Patterson v. State***, 594 So. 2d 606, 609 (Miss 1992) ("The rule that questions not raised in the lower court will not be reviewed on appeal is particularly true where constitutional questions are involved.") (citing ***Stewart v. City of Pascagoula***, 206 So. 2d 325 (Miss. 1968)).[22]

---

[22] Procedural bar notwithstanding, we find that Mississippi Code Annotated Section 97-9-55 (Rev. 2006) is not unconstitutional as applied to these facts. The First Amendment permits States to ban a "true threat." ***Watts v. U. S.***, 394 U.S. 705, 708, 22 L. Ed. 2d 664, 89 S. Ct. 1399 (1969) (per curiam). The protected status of threatening speech is not based upon the subjective intent of the speaker. ***Porter v. Ascension Parish Sch. Bd.***, 393 F.3d 608, 616 (5th Cir. 2004) (citing ***Black***, 538 U.S. at 359). Rather, the speaker must have knowingly and intentionally communicated a potential threat which an objectively reasonable person would interpret as a "'serious expression of an intent to cause a present or future harm.'" ***Porter v. Ascension Parish Sch. Bd.***, 393 F.3d 608, 616 (5th Cir. 2004) (citing ***Doe v. Pulaski County Special Sch. Dist.***, 306 F.3d 616, 622 (8th Cir. 2002)). The Eighth Circuit Court of Appeals set forth the following considerations for determining what constitutes an actionable threat under the Freedom of Access to Clinic Entrances Act (FACE): the reaction of the recipient and of other listeners; whether the threat was conditional; whether the threat was communicated directly to the victim; whether the maker of the threat had made similar statements to the victim in the past; and whether the victim had reason to believe that the maker of the threat had a propensity for violence. ***United States v. Dinwiddie***, 76 F.3d 913, 925 (8th Cir. 1996), *cert. denied*, 519 U.S. 1043, 117 S. Ct. 613, 136 L. Ed. 2d 538 (1996) (citations omitted).

Considering the totality of the circumstances, Hearn's words posed a "true threat." In contrast to the ranting, irrational madman conveyed by his brief, Hearn was diagnosed as having the capacity to distinguish right from wrong. He intentionally communicated the threats to Dr. Moore and to members of the parole board, including Nored. An objectively reasonable person would interpret such statements as "take care of the Judges" or "take out the Judge" as intending to inflict physical harm. Both Dr. Moore and Nored were disturbed enough by Hearn's comments that they felt compelled to warn the judges. Hearn also sent cryptic, ominous letters to both judges prior to directly communicating his threats to Dr. Moore and the parole board. Given Hearn's violent past, Judge Roberts had reason to believe that Hearn was capable of following through with such threats.

28

**V.** **Whether Hearn's conviction was based upon insufficient evidence or was contrary to the overwhelming weight of the evidence.**

**A.** **Sufficiency of the evidence.**

¶53. Hearn argues that the trial court erred in not granting a directed verdict or a judgment notwithstanding the verdict (JNOV). A motion for a directed verdict or JNOV challenges the sufficiency of the evidence. *Hales v. State*, 933 So. 2d 962, 968 (Miss. 2006) (citing *Jefferson v. State*, 818 So. 2d 1099, 1110-11 (Miss. 2002)).

¶54. In reviewing a challenge to the sufficiency of the evidence, this Court will reverse and render if the facts and inferences "'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.'" *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005) (quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)). The evidence will be deemed sufficient if "'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.'" *Bush*, 895 So. 2d at 843 (quoting *Edwards*, 469 So. 2d at 70). The relevant question is whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Bush*, 895 So. 2d at 843 (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). The evidence is considered in the light most favorable to the State. *Bush*, 895 So. 2d at 843 (quoting *Jackson*, 443 U.S. at 315).

¶55. We find that there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Hearn had threatened a judge. Hearn wrote numerous, suspicious

29

letters to Judge Roberts and Judge Bailey before communicating his threats to Dr. Moore and the parole board. He told Dr. Moore that "he would risk incarceration again even if -- if he was caught doing personal injury to either one of them . . . ." Likewise, he told the parole board that he would "take care of" or "take out" the judges who placed him in the penitentiary. Drs. Moore and Nored each considered these as serious threats of harm toward both judges. Hearn's letters and his statements to Dr. Moore and the parole board provided sufficient evidence for a rational juror to find him guilty of intimidating a judge.

**B.    Weight of the evidence.**

¶56.    Hearn argues that the trial court erred in not granting a motion for new trial. A motion for new trial challenges the weight of the evidence. *Hales*, 933 So. 2d at 968 (quoting *Dilworth v. State*, 909 So. 2d 731, 737 (Miss. 2005)).

¶57.    In reviewing a challenge to the weight of the evidence, this Court will overturn a jury verdict "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)). A new trial should be granted "'only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *Bush*, 895 So. 2d at 844 (quoting *Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942, 947 (Miss. 2000)). The Court sits as a thirteenth juror, with the evidence weighed in the light most favorable to the verdict. *Bush*, 895 So. 2d at 844 (citing *Herring*, 691 So. 2d at 957; *Amiker*, 796 So. 2d at 947).

¶58.    We find that the evidence is not so heavily against the verdict to result in an unconscionable injustice. Hearn's only defense was that he never intended his words as

30

actual threats. This is insufficient to outweigh the evidence of Hearn's letters and the testimony from witnesses who heard his statements.

**VI.    Whether cumulative error requires reversal**.

¶59.    Hearn argues that cumulative errors in this case requires reversal.

¶60.    In ***Byrom v. State***, 863 So. 2d 836 (Miss. 2003), this Court held that where harmless error or no reversible error is found, it will determine "whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect." ***Byrom***, 863 So. 2d at 847.  Because we find no errors, this issue is without merit. *See **Harris v. State***, 970 So. 2d 151, 157 (Miss. 2007).

CONCLUSION

¶61.    Because we find no error in the lower court, we affirm Hearn's conviction and sentence.

¶62.    **COUNT I AND COUNT II: CONVICTIONS OF INTIMIDATION OF A JUDGE AND SENTENCES OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.  SAID SENTENCES SHALL NOT BE REDUCED OR SUSPENDED AND APPELLANT SHALL NOT BE ELIGIBLE FOR PROBATION, PAROLE, EARNED TIME OR GOOD TIME CREDIT AND SHALL NOT HAVE HIS SENTENCES REDUCED IN ANY MANNER UNDER MCA 99-19-83.**

        **SMITH, C.J., EASLEY, CARLSON, GRAVES, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.  DIAZ, P.J., NOT PARTICIPATING.**