# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-00990-SCT

*JERRY LYNN LOFTON a/k/a GERRY LYNN*
*LOFTON a/k/a GERRY LOFTON a/k/a JERRY*
*LOFTIN a/k/a JERRY LOFTON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/29/2016 |
| TRIAL JUDGE: | HON. GERALD W. CHATHAM, SR. |
| TRIAL COURT ATTORNEYS: | LUKE PATRICK WILLIAMSON |
| | STACEY ALAN SPRIGGS |
| | ADAM BOWDRE EMERSON |
| COURT FROM WHICH APPEALED: | DeSOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/26/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., MAXWELL AND BEAM, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     A jury found Jerry Lofton guilty of murder.  He was sentenced as a habitual offender

to life without parole.  Lofton now appeals, claiming he was forced to proceed pro se without

knowingly or voluntarily waiving his right to an attorney.  But the record shows he was not

left to his own defense as a pro se litigant. Instead, after being warned of the dangers of self-representation, he asked for and received a "hybrid defense." Lofton made it clear he wished to take the "lead" role in a "co-counsel" arrangement with his court-appointed attorney. And the judge allowed him to proceed in that fashion. Because Lofton "received the best of both worlds—the assistance of counsel while conducting his own defense[,]"[1] he cannot now complain that he was wholly pro se or received inadequate warnings.

¶2. We thus affirm.

## Background Facts and Procedural History

### I. Pretrial

¶3. Edroy James Ballard Jr. was shot and killed on June 3, 2014, in Horn Lake, Mississippi. A DeSoto County grand jury charged Lofton with Ballard's murder. Lofton was deemed indigent, and Adam Emerson was appointed to represent him. Several months later, Emerson filed a motion to reconsider Lofton's indigent status. Emerson informed the trial court that Lofton had refused to meet with him and wished to hire private counsel. Lofton, who had made a $100,000 bond and was employed, told the judge he desired to hire his own attorney.[2] In response, the judge gave Lofton time to secure a private attorney. But he required Emerson to continue his representation of Lofton until Lofton hired a new lawyer. Though Lofton never hired private counsel, he had been granted trial continuances and given considerable time to do so.

---

[1] *Hearn v. State*, 3 So. 3d 722, 735 (Miss. 2008).

[2] Lofton's bond was later revoked. The judge found he had improperly contacted witnesses and had attempted to influence a witness's testimony.

¶4. Then, during a February 4, 2016 hearing, Lofton mentioned representing himself. The judge warned Lofton that his murder charge was very serious. And he "certainly would be no match for the State of Mississippi" if he tried to represent himself. At this point, the judge refused to let Lofton proceed without some type of counsel. The judge also instructed Lofton that if he wanted private counsel, he should secure an attorney quickly.

¶5. Months later, during a status hearing, Lofton asked the court if he could participate in some role in his defense. He insisted he wanted a hybrid defense—a defense in which he would approve all legal decisions and take the "lead" role in a "co-counsel" arrangement. The judge again warned Lofton of the associated dangers of this arrangement. But he granted Lofton's request, instructing Emerson to remain as appointed "co-counsel."

¶6. Less than a month later, Lofton filed a motion for new counsel. He claimed he and Emerson could no longer work together. Despite Lofton's complaints, the judge found Emerson had represented Lofton quite well and had diligently pursued his case. Still, the judge granted Lofton's request and removed Emerson as counsel. The judge then appointed Stacey Spriggs as Lofton's new attorney on July 22, 2016.

¶7. On August 19, 2016, the trial court conducted a hearing, entertaining arguments on numerous motions filed by Lofton. Lofton began with a motion for recusal. He argued the judge was biased against him because he had refused to reconsider revoking his bond. Spriggs informed the judge he had spoken at length with Lofton about the bond-revocation hearing, the burden of proof, and evidentiary matters, and had counseled against a motion for recusal. The judge found no basis to recuse and denied the motion. Lofton also moved for

3

new appointed counsel, claiming Spriggs too was biased against him. He insisted they had trouble talking over the phone, and some mail had been returned when Spriggs moved offices. The judge found no basis to remove Spriggs and denied the motion.

¶8. Six days before trial, the judge heard the State's motion to amend Lofton's indictment to reflect his habitual-offender status.[3] The State presented certified copies of two of Lofton's prior felony convictions. Lofton objected, arguing he needed more time to verify the authenticity of the copies. His objection was overruled, though the judge gave him time to review the documents. After that opportunity, the judge granted the State's motion to amend the indictment. Lofton again moved for new counsel. He claimed Spriggs had laughed at him during the previous hearing. He also reurged his returned-mail claim and that Spriggs was biased against him. The judge denied the motion, noting Spriggs had acted professionally while representing Lofton. In fact, he did not see Spriggs laugh, much less smile, during the previous hearing.

## II. Trial

¶9. Lofton's trial began on September 12, 2016. The judge first determined Lofton was competent to stand trial. And almost immediately after, Lofton began hurling complaints about Spriggs. The judge again denied his request for new counsel. Dissatisfied, Lofton declared he did not want Spriggs to help represent him. He repeatedly mentioned he had the right to waive his attorney and wanted to invoke that right. Recognizing the pitfalls ahead,

---

[3] Months earlier, on June 16, 2016, the State had filed a motion to amend Lofton's indictment to reflect his habitual-offender status. As evidence, it cited two prior felony convictions—a 1981 Tennessee state-court conviction for receiving stolen property and a 2004 federal conviction for felon in possession of a firearm.

4

the judge required Spriggs to remain at the defense table with Lofton. And throughout trial, Spriggs, in fact, consulted with Lofton and assisted him in his defense.

¶10. Trial proceeded and, during voir dire, Lofton and Spriggs each addressed the jury. And Spriggs made peremptory challenges based on Lofton's directions. During voir dire, Lofton continued to complain about Spriggs. He also objected to the order of peremptory strikes and tried repeatedly to derail the trial, urging the proceeding was unfair. The trial judge noted Lofton's statements and objections but overruled his objections.

¶11. After the jury was selected, Lofton again asked to waive counsel. But the judge required Spriggs to remain as counsel to assist in any role Lofton desired. Once the State had made its opening statement to the jury, Lofton opted to deliver his own opening. The State then proceeded with its case, calling three eyewitnesses—Keith Patterson, Daphne Patterson, and Lashawn Wright. All three were present the day of Ballard's murder. And each testified they had seen Lofton with a revolver. They also had seen him flee in a vehicle immediately after the shooting. Wright specifically testified that Lofton came inside and asked another woman, Dontia Mickens, for her car keys and said "I had to hurt one of these n*****s." Wright explained that Mickens refused to give Lofton her keys but did drive him away from the scene. Lofton cross-examined each witness. And he consulted Spriggs for guidance during Wright's cross-examination. The State also called Detective Daniel Pounders, who investigated Ballard's murder, and Kristopher Wingert, who processed the crime scene. The State then called Dr. Mark LeVaughn, a medical examiner, and Starks Hathcock, a forensic firearms analyst. The bulk of these four witnesses' collective testimony was that: (1)

5

Ballard's death was a homicide, (2) Ballard had been shot three times and his body was near Lofton's car, (3) no shell casings were found, and (4) the projectiles removed from Ballard's body were fired from the same .38 revolver. Lofton again opted to conduct the cross-examinations himself. The State then rested.

¶12. Lofton moved for a directed verdict, arguing the State had failed to meet its burden of proof. The judge disagreed. He found the State had made a prima facie case of murder and denied a directed verdict. The judge then asked if Lofton was ready to proceed with his witnesses. Lofton informed the judge he had no witnesses. He claimed he had insufficient time to provide witness names to Spriggs. The judge asked if Lofton was resting his case. Lofton said he was. And the judge confirmed Lofton's decision two more times. Before moving forward, the judge asked him if there was anything else he wanted to put in the record. Lofton told the judge no.

¶13. Before closing arguments, Lofton and Spriggs consulted about jury instructions. Lofton objected to the State's proposed instruction that the jury not draw negative inferences from his decision not to testify in his defense. Lofton claimed this was an improper comment on his right to remain silent. The judge overruled this objection. The jury was instructed, and the parties made their closing arguments. Lofton presented his own closing argument. The jury then retired to deliberate.

¶14. At some point after deliberations began, the jury sent the judge a note asking if Lofton was allowed to call any witnesses. The judge responded with a note, explaining the defense "chose not to call any witnesses," and he instructed the jury to continue its deliberations.

6

Lofton objected. For the first time, he claimed the defense had issued some subpoenas for witnesses and documents, but they were misdated—commanding an appearance for the following day. The judge reminded Lofton that he had specifically asked him—before he rested—if the defense wished to call any witnesses, and Lofton had told him no. So the objection was overruled. But the judge noted that, according to the court clerk, some subpoenas had not yet been returned because they were for out-of-state witnesses, while other subpoenas were returned showing the witnesses as not found. He did allow Lofton to make a record that some subpoenas were filed with an incorrect date.[4]

¶15. The jury found Lofton guilty of Ballard's murder. The judge heard Lofton's post-trial motions on November 22, 2016. In his motion for a new trial, Lofton argued he was forced to proceed pro se and never intelligently waived counsel. He argued his right to present witnesses was violated, the State withheld discovery, and that all of the State's witnesses had lied. He also argued the all-white jury rendered his trial unfair. The trial judge denied Lofton's post-trial motions. He sentenced Lofton as a habitual offender to life in prison without parole. Lofton now appeals.

¶16. Lofton's appellate counsel raises two issues. He argues that, although Lofton proceeded with the assistance of counsel, Lofton essentially was a pro se defendant at trial and was not given proper warnings about self-representation. Alternatively, he suggests Lofton's hybrid counsel was ineffective for misdating subpoenas to secure documents and

---

[4] The judge inquired with the clerk about Lofton's subpoenas and found several were issued on September 9 for a September 14 appearance. The State rested its case September 13.

witnesses for trial.

¶17.   Lofton has also written his own pro se brief.  In it, he claims: (1) a jury instruction improperly commented on his right to remain silent, (2) the judge denied him the right to present witnesses and evidence, (3) the State withheld exculpatory evidence, (4) his attorney was ineffective, (5) he was unfairly surprised by the State's witness Daphne Patterson, (6) all African-American potential jurors were wrongly struck, and (7) the State improperly amended his indictment.

## Discussion

### I.   Lofton's Representation

¶18.   From the outset, the record shows the trial judge and both of Lofton's appointed attorneys exhibited tremendous patience and professionalism as Lofton flip-flopped often in his requests for representation.  One moment he wanted private counsel; the next he wished to represent himself in some fashion.  But what did remain constant, as trial approached, was Lofton's demand to play a substantial role in his defense.  As he pointedly put it, he preferred "hybrid representation."   And he asked for a lead role in a co-counsel arrangement, where his appointed attorney would not make any decisions without Lofton's approval.  The trial judge ultimately granted this request, allowing Lofton to represent himself with assistance of appointed counsel.

¶19.   Despite the judge crafting the exact hybrid arrangement Lofton proposed, Lofton and his appellate counsel now argue Lofton was really a pro se defendant at trial.  And they argue

the trial judge's warnings about the dangers of self-representation were not specific enough.[5] In other words, Lofton did not understand the pitfalls of self-representation. So his decision to proceed pro se was not knowing or voluntary. The record certainly does not support this. Nor does it support that Lofton's defense was wholly pro se.

### A. Lofton's Request to Participate

¶20. The Sixth Amendment to the United States Constitution grants every criminal defendant a right to the assistance of counsel. U.S. Const. amend. VI. To assess if a decision to proceed pro se was "knowingly and intelligently" made, we review whether the defendant was "made aware of the dangers and disadvantages of self-representation[.]" *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541, 45 L. Ed. 2d 562 (1975) (citations omitted). What the record should show is that the defendant "knows what he is doing and his choice is made with eyes open." *Id.* (citation omitted).

¶21. Although Lofton was never without assistance of counsel, the record does show he was specifically warned about and professed an appreciation of the dangers of pro se representation. When an inkling arose of Lofton's desire to participate in his defense, the judge asked if he really wanted to represent himself. In response, the following exchange occurred:

> Lofton:     Well, do you want a yes or no answer? I would like to answer that like this. I think Abraham Lincoln said that a man who represented himself has a fool for a client. If I have a good

---

[5] Lofton argues the trial court failed to comply with Uniform Rule of County and Circuit Court Practice 8.05, that he specifically be warned about the dangers of self-representation. The rules governing waiver of counsel have changed now that the Mississippi Rules of Criminal Procedure have taken effect. *See* Miss. R. Cr. P. 7.1.

9

|            |                                                                                    |
|------------|------------------------------------------------------------------------------------|
|            | attorney, I don't want to represent myself.                                        |
| The Court: | Have you ever heard of Lou Holtz?                                                   |
| Lofton:    | Yes, sir.                                                                           |
| The Court: | Lou Holtz said that not everybody can be a lawyer or doctor, but everybody thinks they can be a football coach. |
| Lofton:    | All right. Okay.                                                                    |

After making this analogy, the judge emphasized that murder was a "very serious charge." And the judge warned Lofton that he "would certainly be no match for the State of Mississippi." Having cautioned Lofton about self-representation, the judge still required Lofton's initial appointed counsel to continue to represent him.

¶22.    But these admonitions aside, we need not dwell on the judge's precautionary warnings or matters of waiver because Lofton "was never left to his own defense" as a wholly pro se litigant. *Hearn v. State*, 3 So. 3d 722, 734 (Miss. 2008) (waiver of counsel or adequate warning analysis is unnecessary when a defendant has hybrid representation); *see also Metcalf v. State*, 629 So. 2d 558, 564 (Miss. 1993) (defendant's argument that trial court erred by not conducting a waiver-of-counsel inquiry was misguided because defendant had hybrid representation). Instead, Lofton initially was fully represented by counsel and, later, through hybrid representation when he opted to participate in his own defense.

¶23.    Having been advised of the danger of pro se representation, Lofton later told the judge "I'd like to play a role in my defense." Or, as he more specifically put it, he wanted "to play the lead." The judge warned Lofton that he was "not a lawyer." To avoid any misunderstanding of his desires, Lofton explained to the judge:

10

What I'm saying is under the rules of URCCC, under the Uniform Rules of Circuit and County Court . . . , I would like to exercise my right to play a role in my defense. I would like for it to be a *hybrid defense*, and I would like to play the lead.

(Emphasis added.) The judge granted Lofton's proposed arrangement. With the assistance of counsel, he said Lofton could have "such participation as [he] want[ed]."[6]

### B. Hybrid Representation

¶24. The aim of hybrid representation is "to strike a balance between the right to counsel and the right to self-representation." ***Henley v. State***, 729 So. 2d 232, 236 (Miss. 1998). "Hybrid representation consists of 'the participation by an attorney in the conduct of the trial when the defendant is proceeding pro se.'" ***Hearn***, 3 So. 3d at 734 (quoting ***Metcalf***, 629 So. 2d at 562-63). It stems from the Mississippi Constitution, Article 3, Section 26, which states that "[i]n all criminal prosecutions the accused shall have a right to be heard by himself or counsel, *or both* . . . ." (Emphasis added.) The following factors are relevant when determining if a defendant has proceeded pro se or received hybrid representation:

> The defendant's accessibility to counsel; whether and how often he consults with counsel up to the point of the request; the stage of trial at which he requests a participatory role in his defense; the magnitude of the role he desires to assume; whether the trial court encourages immediate and constant accessibility of counsel; and the nature and extent of assistance of counsel which has been provided up to the point of the request, including both

---

[6] The judge did however emphasize:

> [Y]ou still have to abide by all the rules of court and all the evidentiary matters and procedures . . . [c]ertainly, you will be free to direct how your trial is conducted, but you will still have to abide by those rules and evidentiary procedures.

And the judge explained that his counsel would help "in that regard."

11

procedural and substantive aid.

*Hearn*, 3 So. 3d at 734 (quoting *Metcalf*, 629 So. 2d at 565).

¶25. Considering these factors, the record shows Lofton always had access to counsel. Lofton's first court-appointed lawyer, Emerson, fully represented him. Emerson conducted discovery, represented Lofton at several hearings, personally examined and cross-examined witnesses at hearings, and filed a variety of motions on Lofton's behalf. Then, nearly three months before trial, Lofton requested a "lead counsel" role in a "co-counsel" defense. The trial judge made sure he understood Lofton's precise request, confirming Lofton wanted to make all decisions and take a lead role in his defense with Emerson's assistance. And when the judge relieved Emerson and appointed Spriggs to represent Lofton, he did so under the same hybrid-representation arrangement that Lofton had previously requested.

¶26. With Lofton taking the lead, Spriggs was not as involved as Emerson. But he was present at all court appearances. And he assisted Lofton in some fashion at every proceeding from his appointment until Lofton's appeal. Much as lead counsel would typically do, Lofton filed motions, made arguments at motion hearings, cross-examined witnesses, made objections, and gave his own opening statement and closing argument to the jury. But Spriggs was still very much involved with Lofton's defense. Spriggs consulted Lofton on pretrial motions and offered opinions about various issues. He also assisted Lofton in voir dire and addressed the jury. He participated in jury selection and lodged peremptory challenges. And he also consulted with Lofton during his cross-examination of Lashawn Wright. Spriggs helped when Lofton struggled laying evidentiary foundations to impeach

12

a witness. And when the judge sustained objections to the admission of some evidence, Spriggs had exhibits marked for identification for appellate review. He also consulted Lofton on jury instructions. And he helped Lofton during the post-trial hearing, conferencing with him several times about motions and arguments.

¶27. The relevant facts and legal arguments before us are quite similar to those this Court faced in **Hearn v. State**. In that case, after being found guilty of intimidating a judge, the defendant appealed and, like Lofton, argued he was "forced" to proceed pro se. **Hearn**, 3 So. 3d at 732. But after considering "the totality of the circumstances," this Court disagreed. **Id.** at 735. We found Hearn, like Lofton, received hybrid representation. His attorney "was available throughout the entire trial and participated on several occasions." **Id.** So his legal "role was 'not merely that of a skilled bystander, but of a substantive litigator.'" **Id.** (quoting **Metcalf**, 629 So. 2d at 565). Because Hearn was "never . . . fully without the assistance of counsel," he could not "now complain about inadequate warnings . . . ." **Id.**

¶28. Lofton's situation is analogous to **Hearn**. From early on, well before trial, Lofton specifically asked to be lead counsel. And just as he wished, no decisions were made without his approval. While at times during trial Lofton became frustrated and claimed he wanted to waive counsel, the judge required Spriggs to continue to assist Lofton, as Lofton desired.[7] And Spriggs in fact remained constantly accessible, rendering both procedural and

---

[7] "This Court has held that a defendant's request during trial to dismiss his defense counsel and to continue the case until another attorney could be retained or appointed is untimely and that the decision to grant such a motion lies within the sound discretion of the trial court." **Estelle v. State**, 558 So. 2d 843, 847 (Miss. 1990). *See also* **Bostic v. State**, 531 So. 2d 1210, 1214 (Miss. 1988); **Harrison v. State**, 520 So. 2d 1352, 1353 (Miss. 1987); and **Collins v. State**, 369 So. 2d 500, 501 (Miss. 1979).

substantive assistance before, during, and after Lofton's trial. So, in short, Lofton "received the best of both worlds—the assistance of counsel while conducting his own defense." **Hearn**, 3 So. 3d at 735. And because Lofton was never left to his own defense, the trial court was not required to insure he properly waived counsel or warn him as though he were wholly pro se. **Id.**

## II. Ineffective Assistance of Counsel

¶29. Lofton's next argument takes the opposite approach of his first. Though he initially pitched that he was forced to proceed wholly pro se, he alternatively argues his trial attorney was ineffective for filing trial subpoenas with incorrect appearance dates.

¶30. This balancing act by Lofton proves difficult because when a defendant proceeds wholly pro se, any standby counsel is "without authority, discretion or control. . . ." **Estelle v. State**, 558 So. 2d 843, 847 (Miss. 1990). So any "charge that [Spriggs] rendered constitutionally ineffective assistance is without merit." **Id.** In other words, a defendant cannot complain of ineffective assistance of counsel if he or she proceeds with appointed counsel only standing by to provide assistance if called upon. Thus, if Lofton had proceeded wholly pro se, as he urges, he has no **Strickland** claim. **Strickland v. Washington**, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

¶31. But in truth, Lofton received hybrid representation. We consider this fact along with the principle that, typically, ineffective-assistance claims are "more appropriately brought during post-conviction proceedings." **Archer v. State**, 986 So. 2d 951, 955 (Miss. 2008). "This is because during direct appeals the Court is limited to the trial court record in its

14

review of the claim . . . ." *Id.* And from this record, we cannot discern much about his subpoena claim.

¶32.  After the jury began deliberating, Lofton for the first time took issue with some trial subpoenas.  At that point, he tried to make a record about those subpoenas and who bore the blame for supposedly incorrect appearance dates.  Lofton claims Spriggs filed eight subpoenas with an incorrect appearance date.  But the record does not contain any filed, returned copies of those subpoenas.  Nor do any of those eight subpoenas bear Spriggs's certification signature, while previous subpoenas do.  The judge did mention that the court clerk had informed him that some recipients were either in Memphis or could not be located.  But other than that, there is little discussion and the record is pretty bleak.  There is no definitive proof or finding about who actually prepared those eight subpoenas or any mention why September 14, 2016, was selected as the appearance date.  Nor is it apparent why Lofton failed to seek a continuance, much less mention the allegedly defective subpoenas, when the State rested and defense witnesses were not present.  Furthermore, the State does not stipulate that the record is sufficient to review this issue on direct appeal. *See Read v. State*, 430 So. 2d 832, 841 (Miss. 1983).  Rather, it insists the record is lacking for *Strickland* purposes.

¶33.  In cases like this, where the record is insufficient to address a *Strickland* claim, this Court denies relief, preserving the defendant's right to raise the issue through a post-conviction-relief petition. *Archer*, 986 So. 2d at 955.  And we do so here.

   III.    **Jury Instruction Eleven**

15

¶34. Lofton next claims that the judge improperly instructed the jury to not draw unfavorable inferences against Lofton for him exercising his right to remain silent and not testify in his defense.[8] The State proposed this instruction, which the judge granted over Lofton's objection that the instruction impermissibly commented on his right to remain silent.

¶35. "Jury instructions are generally within the discretion of the trial court[.]" *Moody v. State*, 202 So. 3d 1235, 1236-37 (Miss. 2016) (citation omitted). If the given instructions fairly state the law and create no injustice, there is no reversible error. *Fears v. State*, 779 So. 2d 1125, 1127 (Miss. 2000).

¶36. Typically it is the defendant, not the State, who requests the jury be instructed against drawing negative inferences when a defendant chooses not to testify. *E.g.*, *Ragan v. State*, 318 So. 2d 879, 880-81 (Miss. 1975); *Wood v. State*, 221 Miss 901, 907, 74 So. 2d 851, 853 (1954); *Funches v. State*, 125 Miss. 140, 87 So. 487, 488 (1921). "[I]t is subject to debate whether such an instruction helps or harms the defendant who does not testify." *Schuck v. State*, 865 So. 2d 1111, 1124 (Miss. 2003). Often, there are tactical reasons in play when a defendant opts for or against the instruction.

¶37. Mississippi has never addressed a trial judge giving, over a criminal defendant's objection, a cautionary instruction that the jury not draw any adverse inference from the defendant's decision not to testify. But the United States Supreme Court has. In *Lakeside*

---

[8] Jury Instruction Eleven, State's Instruction Eight, states in full:

Members of the Jury, the Defendant has exercised his constitutional right to remain silent, and you must not draw any unfavorable inferences against the Defendant for his decision not to testify.

16

*v. Oregon*, the Supreme Court recognized "it may be wise for a trial judge not to give such a cautionary instruction over a defendant's objection." *Lakeside v. Oregon*, 435 U.S. 333, 340, 98 S. Ct. 1091, 1095, 55 L. Ed. 2d 319 (1978). Even so, the high court held "the giving [by a State trial judge] of such an instruction over the defendant's objection does not violate the privilege against compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments."[9] *Id.* at 340-41, 98 S. Ct. at 1095. This Court agrees. While the better practice is to follow the defendant's strategic choice, a proper cautionary instruction concerning a defendant's failure to testify, even when given over defendant's objection, is not itself prejudicial error.

¶38. Looking at instruction eleven, it fairly states the law that the jury not draw unfavorable inferences against Lofton for his exercising his right to remain silent and not testifying in his defense. *See* U.S. Const. amend. V; Miss. Const. art. 3, § 26. Thus, there is no prejudice, injustice, or reversible error.

### IV.     Self-Defense Theory

¶39. Lofton next claims he was wrongly kept from calling witnesses or presenting evidence. Thus, he was hindered from pursuing a self-defense theory and jury instruction. There is no support for this assertion.

¶40. Nowhere in the record did the judge deny Lofton the right to present witnesses or

---

[9] In reaching this decision, the Supreme Court noted that "[m]ore than 50 years ago, Judge Learned Hand dealt with this question in a single sentence: 'It is no doubt better if a defendant requests no charge upon the subject, for the trial judge to say nothing about it; but to say that when he does, it is error, carries the doctrine of self-incrimination to an absurdity.'" *Lakeside*, 435 U.S. at 341 n.12, 98 S. Ct. at 1095 n.12 (quoting *Becher v. United States*, 5 F.2d 45, 49 (2d Cir. 1924)).

17

evidence. What actually happened was that Lofton showed up for trial without either. He rested without even attempting to call witnesses, offer any evidence, or otherwise present a defense. Furthermore, Lofton never requested a self-defense instruction. Still, even if he had, there was no evidentiary support to grant it. *Hearn*, 3 So. 3d at 739. This Court does not hold trial judges in error over instructions that were never requested. *Cf. Rubenstein v. State*, 941 So. 2d 735, 788-89 (Miss. 2006). And it would be improper to do so here.

¶41. Because the trial judge did not deny Lofton the right to present witnesses or evidence, there is no error.

### V. *Brady* Violation

¶42. Lofton also suggests the State improperly withheld exculpatory evidence, entitling him to a new trial. The evidence he mentions concerns a forensic interview of his seven-year-old son Lynn—an interview he suggests somehow shows Lofton's shooting was justified or committed in the heat of passion. After review, there is no indication that favorable evidence was suppressed and we see no cognizable *Brady* claim.

¶43. Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963). "*Brady* claims involve the discovery, after trial of information which had been known to the prosecution but unknown to the defense." *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) (internal quotation marks and citation omitted). But evidence is not deemed

18

suppressed if "the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Id.* (citation omitted). *See also* **Rector v. Johnson**, 120 F.3d 551, 560 (5th Cir. 1997); **Williams v. Scott**, 35 F.3d 159, 163 (5th Cir. 1994). And the State has no obligation to furnish a defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence. **Gibbs v. Johnson**, 154 F.3d 253, 256 (5th Cir. 1998).

¶44. Here, Lynn Lofton's interview is not part of the record before us. But the material portions Lofton now claims were suppressed are contained in a report by Dr. Criss Lott.[10] This report was provided to the State; Lofton's first attorney, Emerson; and the court. At a June 17, 2016 hearing, at which Lofton was present, Emerson stated he had received Dr. Lott's report. So Lofton's counsel had a copy of it. And at no point did Lofton claim he had not received or seen the report, which the judge considered when determining Lofton's competency.

¶45. According to Dr. Lott's report, on the day of the shooting, a forensic interviewer from a child advocacy center spoke with Lofton's son. The seven-year-old told the interviewer that Ballard was lying on the ground when his dad shot him four times. Lynn recalled that after Lofton shot Ballard, Lofton asked him "how you like it." Dr. Lott's report also notes that Lynn had mentioned to the interviewer that, before the shooting, his dad told Ballard "he doesn't have any business messing with these kids"—meaning Lynn and his sister. But

---

[10] The judge ordered Lofton to undergo a competency evaluation, but Lofton refused to cooperate with Dr. Lott. Because Lofton would not agree to be interviewed, Dr. Lott reviewed police reports, interviews, medical records, and court documents to assess Lofton, and drafted a detailed report in which he discussed Lofton's mental status.

Lott's report recounts Lynn did not elaborate what this meant. Lynn told the investigator the man had only said "hello" to him and his sister, and did not detail how Ballard was messing with them. There is also mention in Lott's report that Lofton's getaway driver, Dontia Mickens, told police she heard the gunshots. At that point, Lofton "came running inside" and told her "I shot him, I shot him. He kept messing with the kids." Lofton was holding a gun when he asked her to help him flee.

¶46. Beyond Dr. Lott's report, at Lofton's bond-revocation hearing, an officer testified that Lynn had told a forensic interviewer that he had seen his father shoot someone. Lofton's girlfriend also testified at the hearing. She too testified that their seven-year-old son Lynn had seen Lofton shoot someone. She also explained that Lofton had been trying to coax Lynn into falsely claiming someone else had shot the victim.

¶47. Again, there is no **Brady** suppression if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence. *See **Lawrence v. Lensing**,* 42 F.3d 255, 257 (5th Cir. 1994); *see also **West**,* 92 F.3d at 1399. Here, the State exercised an open-file policy, providing Lofton's attorney inspection of all materials in its possession. Furthermore, the State gave Lofton's attorney a copy of Mickens's statement to the police. And his attorney also received a copy of Dr. Lott's report, detailing Lynn's interview and Mickens's statement. Lofton was also present during his bond-revocation hearing where Lynn's interview was discussed. Because Lofton was certainly well aware of the essential facts he now claims were withheld, there was no **Brady** suppression.

¶48. Furthermore, the **Brady** rule applies only to exculpatory and impeachment evidence—not to inculpatory or neutral evidence. **United States v. Nixon**, 881 F.2d 1305, 1308 (5th Cir. 1989). *See also* **Andrews v. Collins**, 21 F.3d 612, 626 (5th Cir. 1994); **Lawrence**, 42 F.3d at 257. So, to the extent the gist of this evidence was inculpatory, i.e., that Lynn affirmatively stated his father had shot Ballard while he was on the ground, it does not qualify as **Brady** material.

## VI.    Discovery Violation

¶49. Though the record before us does not show the State listing Daphne Patterson as a trial witness, she testified at Lofton's trial. Lofton now claims the non-disclosure unfairly surprised him and amounted to a discovery violation.

¶50. If the State attempts to call a previously undisclosed witness, the defense may object and be afforded an opportunity to interview the witness. URCCC 9.04(I).[11] If, after the interview, the defense claims unfair surprise or prejudice, the judge may either exclude the witness or grant a continuance or mistrial. *Id.* Lofton did not object to Patterson testifying at trial. Instead, he cross-examined her and had even attempted to subpoena her himself. Because Lofton did not object or in any way claim unfair surprise at trial, he has not preserved a discovery-violation-based claim. *See* **Brewer v. State**, 725 So. 2d 106, 121 (Miss. 1998). *See also* **Havard v. State**, 928 So. 2d 771, 791 (Miss. 2006). Thus, he has forfeited this claim.

## VII.   *Batson* Violation

---

[11] Again, the Mississippi Rules of Criminal Procedure now control discovery violations in criminal cases. *See* Miss. R. Cr. P. 17.9.

¶51. During voir dire, Lofton used his own peremptory challenges to strike all African-American jurors on the panel. Though it was Lofton, not the State, who employed this tactic, he now asserts his own removal of African-American jurors resulted in an unfair trial.

¶52. Both Lofton and Spriggs participated in jury selection. And during voir dire, no *Batson* challenges were raised. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).[12] When a defendant fails to raise a *Batson* challenge at trial, he or she is procedurally barred from doing so on direct appeal. *Corrothers v. State*, 148 So. 3d 278, 305-06 (Miss. 2014). But more pertinent here is the fact Lofton had no grounds to claim a *Batson* violation. By his own admissions—both in the record and on appeal—it was Lofton who desired to strike all black jurors out of fear they disliked him. And in line with Lofton's strategy, Spriggs utilized Lofton's peremptory challenges to strike all potential African-American jurors. Again, Lofton got just what he asked for and cannot now claim error about a perceived problem he created.

### VIII. Habitual-Offender Enhancement

¶53. Lastly, while Lofton argues he was improperly sentenced as a habitual offender, he points to no viable reason why. He does not claim the State's request to amend his sentence was untimely. Nor does he mention any deficiency in his qualifying convictions and sentences. Instead, his complaint is that he had insufficient time to review the certified

---

[12] The privilege to use peremptory strikes "is subject to the commands of the Equal Protection Clause." *Batson*, 476 U.S. at 89, 106 S. Ct. at 1719. The Equal Protection Clause prohibits using peremptory strikes to engage in racial discrimination. *Id.*

copies of his prior convictions—a 1981 Tennessee state-court conviction for receiving stolen property and a 2004 federal conviction for felon in possession of a firearm. This is simply unsupported by the record.

¶54. Under Uniform Rule of Circuit and County Court Practice 7.09, an indictment may be amended to charge the defendant as a habitual offender if the defendant is afforded a fair opportunity to present a defense and is not unfairly surprised.[13] ***Adams v. State***, 772 So. 2d 1010, 1019-20 (Miss. 2000). And on June 16, 2016, well in advance of his trial, the State moved to amend Lofton's indictment to seek an enhanced sentence under Mississippi Code Section 99-19-81. *See* Miss. Code Ann. § 99-19-81 (Rev. 2015). The State's motion specifically detailed two of Lofton's prior felony convictions that resulted in a sentence of one year or more. And Lofton received a copy of the motion.

¶55. Then, almost three months later, on September 6, 2016, the trial judge heard argument and evidence for the amendment. The State presented certified copies of each of Lofton's judgments of convictions and sentencing orders. For months Lofton had known about the convictions relied upon by the State. But he now complained he needed additional time to verify the authenticity of the certified copies. Though Lofton asked for a continuance, the court denied one. Instead, the judge gave him additional time to review the certified documents. Lofton objected to the amount of time he was given but could not point to any deficiencies in the documents. His appointed counsel, Spriggs, candidly advised the court he had "no objection" to the certified copies of the convictions, which appeared to be the

---

[13] Since the adoption of the Mississippi Rules of Criminal Procedure, the rules for amending indictments have changed. *See* Miss. R. Cr. P. 14.4.

same ones "in the motion from the State." Based on the certified copies of both convictions, the judge ultimately amended Lofton's indictment to reflect his habitual-offender status under Section 99-19-81.

¶56.   At his sentencing, Lofton, complained about his prior convictions but offered nothing to show why they were deficient for habitual-offender purposes. The judge properly sentenced Lofton to life in prison without the possibility of parole, the only possible sentence under Section 99-19-81.

¶57.   Lofton had ample notice and opportunity to prepare a defense against an enhanced sentence; he just failed to do so.

### Conclusion

¶58.   After being sufficiently warned of the dangers of self-representation, Lofton was provided with exactly what he asked for—a hybrid defense. The trial judge afforded Lofton every opportunity to defend his case and was particularly sensitive to see that Lofton's rights were not violated. Because we see no error in the trial court's decisions, we affirm Lofton's conviction and sentence to life in prison as a habitual offender.

¶59.   **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, BEAM AND ISHEE, JJ., CONCUR. CHAMBERLIN, J., NOT PARTICIPATING.**