# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-KA-00772-SCT

*JABRIEN WILLIAMS a/k/a JABRIEN DUWAN*
*WILLIAMS a/k/a JABRIEN D. WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 06/16/2020 |
| TRIAL JUDGE: | HON. DEWEY KEY ARTHUR |
| TRIAL COURT ATTORNEYS: | JOHN K. BRAMLETT, JR. |
| | KATIE NICOLE MOULDS |
| | ASHLEY RIDDLE ALLEN |
| | BENTLEY E. CONNER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CYNTHIA ANN STEWART |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/24/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     Jabrien Williams was twenty-two years old when he convinced fourteen-year-old JR[1]

to unlock the window of an unoccupied bedroom of her family's ground-floor apartment.

Once inside, Williams had sex with the minor. Days later, Williams texted JR, attempting

---

[1] To protect the identity of the minor victim, only her initials are used.

to have sex with her again. Soon after, JR's stepfather discovered the messages on the family's iPod. JR told her stepfather that Williams sent the messages to her. She then informed her mother she had sex with Williams in their apartment.

¶2. Williams was indicted on one count of sexual battery. The specific charge was that he engaged in sexual penetration with a child fourteen years or older but under sixteen years of age, while Williams was at least thirty-six months older. *See* Miss. Code Ann. § 97-3-95(1)(c) (Rev. 2020). Before trial, Williams's counsel disclosed that one of Williams's defense theories would be that someone else—namely, Williams's younger brother, who went to school with JR—sent the text messages from Williams's phone. But at trial, Williams employed a different defense. He steadfastly denied that the phone number used to send JR the messages was his. His younger brother also testified the number was not Williams's.

¶3. Surprised by this, during the first day of trial, the State ran the phone number through the Madison County Detention Center logs. After the State rested, it learned this exact phone number was listed by Williams as his contact number when he received an ankle monitor for an unrelated crime. Realizing Williams had been wearing the GPS monitor during the relevant time frame, the State inquired further and learned GPS coordinates placed Williams at JR's apartment the night she reported he had sex with her. Over Williams's objection, the judge permitted the State to introduce this evidence during its rebuttal.

¶4. Williams was convicted and now appeals. He challenges several evidentiary rulings, the most significant being the admissibility of the State's rebuttal evidence. Williams now

2

alleges the State improperly withheld this evidence. He says the suppression violated not only Mississippi Rule of Criminal Procedure 17.2, which mandates certain evidence be produced pretrial, but also *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963), which constitutionally prohibits the prosecution from withholding potentially exculpatory evidence. But the record does not support his contention.

¶5. Instead, the record shows the State had no knowledge that Williams had listed this number when receiving an ankle monitor in an unrelated case—or any reason to know of its potential materiality—before trial. So it had no duty to blindly search for or produce this information under Rule 17.2. Further, upon the State's discovery and assessment that the number and tracker had become relevant, the State advised the trial court and Williams's counsel. After learning this information, Williams's counsel was given an opportunity to review the evidence. He conceded he was familiar with the witness who would sponsor the GPS information and her qualifications as an expert. He reviewed the information overnight, then chose not to seek a continuance.

¶6. Furthermore, the State had no pretrial duty to produce this evidence under *Brady*. This evidence was not exculpatory—not even potentially exculpatory. And importantly, it was not unknown to Williams, who—unlike the State—was well aware that he had been wearing an ankle monitor during the charged offense. He was also the one who had listed the number he later used to text JR as his official contact when he received the ankle monitor. And because he had not pursued an alibi defense, the State had no duty to pursue and furnish this evidence before trial.

3

¶7.     The bottom line is that the admission or exclusion of evidence falls within the trial court's discretion.  We have reviewed all the trial court's evidentiary calls that Williams contests and discern no abuse of discretion.  We therefore affirm.

## Procedural History

¶8.     Because Williams aims his appeal at evidence admitted or excluded at trial, in relaying the procedural history, we focus on the trial court's evidentiary rulings.

### I.      Pretrial Evidentiary Rulings

#### A.      Statement by Williams's Brother

¶9.     Before trial, the State moved to exclude Williams's younger brother's statement.  This statement described JR's playing with his hair and "twerking" on his lap during a bus ride to school.  The trial judge excluded the statement under Mississippi Rule of Evidence 412(a), which prohibits evidence of the victim's past sexual behavior in criminal cases alleging sexual offenses.  Williams's counsel argued this evidence should be included because one of Williams's defense theories was misplaced blame.  According to counsel, JR texted back and forth with Williams's brother, and Williams's lawyer expressed that he "believed that some of the text messages that the State intends to offer [against Williams] were actually between the victim and [Williams's] brother, not with him."  In response, the trial judge ruled that Williams's brother could testify that the messages the State intended to introduce were from him, not Williams, but under Rule 412, the brother could not testify about JR's flirting with him or "twerking" on his lap.

#### B.      Photographs of JR

4

¶10. The State also moved to exclude photographs of JR taken as part of the forensic medical exam. These photos showed bruising unrelated to the sexual battery. Williams intended to show JR's stepfather corporally punished her, thus establishing a motive for JR to lie about Williams to avoid further punishment. The State objected to the photos as irrelevant and more prejudicial than probative. *See* Miss. R. Evid. 402, 403.

¶11. Because Williams had not offered any evidence yet to establish the relevance of these photos, the trial court sustained the State's objections. Williams could proffer the photos, but the trial court would not admit them unless and until JR testified and her testimony made the photos relevant. When JR testified at trial, Williams's counsel cross-examined her about an alleged text-message exchange with Williams's younger brother that occurred after Williams was arrested. Williams's counsel tried to get JR to say that she conveyed to the brother that Williams was innocent. His examination aimed at probing whether JR had implicated Williams at the behest of her parents, who would beat her if she recanted. However, JR denied such a conversation occurred.

¶12. JR did testify that getting in trouble with her parents could lead to "a whooping." But the trial court deemed this statement alone insufficient for the photographs to become admissible. When the forensic medical examiner testified, her report—which included the photographs—was marked for identification only.

## II. State's Case-in-Chief

¶13. The State's main witness was JR. She described how Williams messaged her late one night via a social-media app, around 1:00 or 2:00 a.m. Williams said he was about to come

by and get a battery pack from JR's brother, who was not home at the time. JR's family lived in a ground-floor apartment. And Williams asked JR to unlock the window to her brother's room. This room was next to hers and down the hall from the rest of her family. JR complied and went back to her room. Williams then messaged JR to come to her brother's room. When she did, Williams initiated sexual contact with JR, performing both oral sex and intercourse with her.

¶14. In the days following the encounter, Williams sent JR text messages to her iCloud account. The messages were sent from a Mississippi-area-code phone number ending in 2190. In these messages, Williams kept coaxing JR to let him pick her up from a friend's house so they could have sex again. The State introduced screenshots of these explicit messages during JR's testimony.

¶15. Days later, JR's stepfather discovered the messages on his children's iPod. He asked who had sent them. And JR admitted, "Jay-bo," which was Williams's nickname. JR's stepfather then insisted she tell her mother what happened. When JR did, her mother contacted the police.

¶16. Based on the State's evidence, the trial judge denied Williams's motion for directed verdict.

### III. Williams's Defense

¶17. Williams's younger brother testified in Williams's defense. But he was never asked if he had sent the messages. Nor did he testify in line with defense counsel's earlier suggestion at the pretrial hearing that he, not Williams, sent the explicit messages. Instead,

6

at trial, Williams's younger brother testified that he had never seen the 2190 phone number. He was also positive it had never been his brother's phone number.

¶18.	Williams also testified. He claimed he was not familiar with the 2190 number. And phone records subpoenaed from Verizon showed the subscriber to the 2190 number did not list a name. Williams insisted that during the relevant time frame he was using another number issued by a different cell-phone provider. Williams also denied entering JR's brother's room the night in question. And he denied having sex with JR. Instead, he claimed he was somewhere else entirely—that he had been working at a Nissan-supplier company that night.

¶19.	On cross-examination, Williams continued to deny the 2190 number was his. But he conceded there were several similarities between him and the person who sent the messages to JR from the 2190 number. For example, the messages from that number referenced someone named Mila in Atlanta. And Williams admitted he had a girlfriend named Mila. He also admitted Mila went to college in Atlanta.

### IV.	State's Rebuttal

¶20.	In rebuttal, the State sought the trial court's permission to offer evidence that Williams had listed the 2190 phone number when registering a court-mandated GPS ankle monitor. He had been required to wear the monitor during his house arrest in an unrelated criminal matter in Ridgeland, Mississippi.

¶21.	The State argued that, as the trial progressed, it realized Williams's defense strategy differed from what he had pushed at his pretrial hearing. Originally, the State believed, as

Williams's attorney suggested at a pretrial hearing, that Williams's defense would be that the younger brother, not Williams, sent JR the text messages. But based on Williams's opening statement and his counsel's questioning of witnesses, it became apparent Williams's defense was that the phone number was not his. So during trial, the State ran the phone number through Madison County Detention Center logs. And after the State rested, it learned the 2190 number was the same number Williams listed in his contact information for the GPS ankle monitor that he was wearing during the time of the charged offense. The State inquired further and learned the ankle monitor's GPS coordinates placed Williams at JR's apartment the night she said he had sex with her.

¶22. Williams's counsel objected, citing undue surprise and the State's failure to disclose this information in discovery. The court initially ruled evidence that Williams gave the 2190 number as his contact to law enforcement was admissible as sheer rebuttal. But in the court's view, the question of the GPS coordinates was a closer issue. The trial court reserved ruling on the GPS evidence until the following day. In the meantime, at the defense attorney's request, the trial court encouraged Williams to reconsider the State's plea offer in light of the State's rebuttal evidence that not only connected Williams to the 2190 phone number but also placed him at the victim's apartment.

¶23. The following day, the trial court ruled the State could introduce the GPS evidence as well. While Williams's counsel claimed surprise that his client had been wearing a GPS ankle monitor, the trial court noted that Williams was certainly aware he had been wearing it. The State called Tammy Childress, director of Correctional Counseling of Mississippi,

8

who had placed the ankle monitor on Williams. She testified not only about Williams's providing the 2190 number but also about his GPS location. Childress, without objection, introduced Google satellite images of JR's apartment complex, with a dot representing Williams's GPS-monitored location at JR's apartment the night JR testified Williams had sex with her.

### V. Williams's Conviction

¶24. The jury found Williams guilty of sexual battery. The trial court sentenced him to thirty years' imprisonment, with the last sixteen years suspended, followed by five years' supervised probation. After an unsuccessful posttrial motion, Williams timely appealed.

### Discussion

¶25. On appeal, Williams argues the trial court erred by allowing the State's rebuttal evidence, refusing to admit his brother's statement about JR's "quasi sexual" behavior toward his younger brother, and excluding the forensic-exam photos. He also questions the sufficiency of the evidence.

¶26. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence." *Fisher v. State*, 690 So. 2d 268, 274 (Miss. 1996). And "[t]he determination of whether evidence is properly admitted as rebuttal evidence" falls within this discretion. *McGaughy v. State*, 742 So. 2d 1091, 1093 (Miss. 1999). "Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Fisher*, 690 So. 2d at 274. As discussed below, Williams fails to demonstrate any abuse of discretion, let alone one that prejudiced him.

9

## I. Rebuttal Evidence

¶27. First, Williams argues the trial judge wrongly allowed Childress to testify in rebuttal. He claims the State's actions violated Mississippi Rule of Criminal Procedure 17.2 and his constitutional rights to due process and effective assistance of counsel.

¶28. But the State did not violate Rule 17.2. This rule requires the prosecution to disclose certain information and evidence that "is in the possession, custody, or control of the State, the existence of *which is known* or by the exercise of due diligence may become known to the prosecution[.]" Miss. R. Crim. P. 17.2 (emphasis added). And here, the information about Williams's ankle monitor was not initially related to the sexual battery, much less even known by the State, until *after* trial had commenced and the State had rested. The State did not learn about it until it began to further investigate the number during trial. It only did so when it became apparent Williams's defense was to deny the 2190 number was his and not merely to suggest his brother or someone else used his phone. Without citing any relevant authority, Williams insists the State would have discovered this information sooner had it fulfilled its "duty to investigate." But again, based on Williams's counsel's representations at the pretrial hearing, the State had no reason to anticipate Williams would deny the 2190 number was his. And consequently, the State had no reason or disclosure-based duty to check this number against the Madison County Detention Center logs. Nor was an alibi defense raised or noticed by Williams.

¶29. Still, Williams likens the State's failure to obtain and disclose this information sooner to a ***Brady*** violation. *See **Brady***, 373 U.S. at 87. But ***Brady*** does not apply. A due process

10

violation under *Brady* occurs when the prosecution suppresses material evidence "favorable to an accused." *Id.* And here, discovery that his number linked him to an ankle monitor, which placed him at JR's apartment that night, was decidedly *unfavorable* to him.

¶30. Moreover, "*Brady* claims involve the discovery, *after trial* of information which had been known to the prosecution but *unknown to the defense*." *Lofton v. State*, 248 So. 3d 798, 810 (Miss. 2018) (emphasis added) (quoting *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996)). But here, during trial, the State brought this potential rebuttal evidence to the trial court's and Williams's counsel's attention. While Williams's counsel claimed unfair surprise, as this Court has said, "the State has no obligation to furnish a defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence." *Id.* (citing *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th Cir. 1998)). And although this evidence is not exculpatory, as the trial court pointed out, while counsel may have been surprised, the fact Williams was wearing a GPS monitor at the time he had sex with JR was hardly unknown to Williams.

¶31. Williams latches to his counsel's apparent surprise and alternatively argues that the State's failure to discover this information sooner somehow led to his being denied the right to effective assistance of counsel. But Williams fails to articulate how, under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), his counsel's performance was deficient and prejudicial. The cases he cites are inapposite—all involving defense counsels' advising their clients to plead guilty without first conducting an investigation. To the extent Williams suggests his counsel's lack of awareness of the ankle

11

monitor led to advising Williams *not* to plead guilty, Williams cannot show prejudice. The record clearly shows that, once the State's potential rebuttal evidence came to light, the trial court gave Williams the opportunity to consult with his counsel and reconsider his decision to reject the State's guilty plea. And the State kept the plea on the table until Williams finally rejected it, prompting the State to continue with trial and call the rebuttal witness. Furthermore, Williams's counsel was given time to evaluate the newly discovered evidence and assess the qualifications of the proposed sponsoring witness. Yet he did not seek a continuance.

¶32. In sum, Williams fails to demonstrate that the trial court abused its discretion by allowing the State to introduce rebuttal evidence refuting Williams's contention that the 2190 number was not his and that he was not in the apartment when JR said the sexual battery occurred.

## II. Excluded Evidence

¶33. Next, Williams argues the trial court erred by excluding testimony by Williams's brother of "quasi sexual" behavior between JR and his brother on the school bus. Williams further asserts the trial court erred by precluding the forensic medical examiner from testifying about evidence that JR had been beaten by her stepfather. Williams suggests this evidence, "taken in conjunction with the evidence allowed by the court, provides a defense that Mr. Williams did not commit the crime with which he is charged." But Williams's insistence that this evidence "should have been allowed under both Rules 412 and 401 of the Mississippi Rules of Evidence" is unavailing.

12

¶34. As to his brother's statement, Rule 412(a) deems inadmissable, in criminal cases involving alleged sexual offenses, both evidence of a victim's past sexual behavior and reputation or opinion evidence of a victim's past sexual behavior. While Rule 412(b) provides several exceptions, none apply to evidence that JR danced suggestively toward Williams's brother or played with his brother's hair on the school bus. *See* Miss. R. Evid. 412(b).

¶35. Moreover, "[t]he purpose of Rule 412 is 'to prevent the introduction of irrelevant evidence of the victim's past sexual behavior to confuse and inflame the jury into trying the victim rather than the defendant.'" ***Burgess v. State***, 178 So. 3d 1266, 1277 (Miss. 2015) (quoting ***Hughes v. State***, 735 So. 2d 238, 273 (Miss. 1999)). Here, because consent is not a defense to sexual assault of a minor under Section 97-3-95(1)(c), any evidence that JR acted sexually—even "quasi sexually"—toward anyone is completely irrelevant. *See* Miss. R. Evid. 402 ("Irrelevant evidence is not admissible."). Thus, the trial court did not abuse its discretion by excluding evidence that JR had "twerked" on the bus.

¶36. As to the forensic-exam photos, Rule 401 defines relevant evidence as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence[.]" Miss. R. Evid. 401(a). But the fact must be "of consequence in determining the case." Miss. R. Evid. 401(b). Here, the trial judge deemed evidence that JR's stepfather corporally punished her to be of no consequence to whether Williams had sex with JR. While one of Williams's defense theories was that JR had motive to lie to avoid punishment

13

from her parents, Williams failed to develop this theory sufficiently to make relevant the photographs of non-sexual bruising.

### III. Sufficiency of the Evidence

¶37. Finally, Williams generally asserts a sufficiency-of-the-evidence challenge.

¶38. The test for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State and giving the State the benefit of all favorable inferences reasonably drawn from the evidence, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Williams v. State*, 285 So. 3d 156, 159 (Miss. 2019) (citing *Martin v. State*, 214 So. 3d 217, 222 (Miss. 2017); *Hughes v. State*, 983 So. 2d 270, 276 (Miss. 2008)). Here, Williams does not even state the essential elements of the charged crime. Nor does he address which element or elements he believes the State failed to prove. Instead, he discusses several cases dealing with possession of contraband. But he does not explain how these wholly irrelevant cases support his claim that the evidence that he sexually battered a minor was insufficient. Thus, we have no obligation to address this issue.[2] *Simmons v. State*, 805 So. 2d 452, 487 (Miss. 2001) ("Failure to cite relevant authority obviates the appellate court's obligation to review such issues." (citing *Williams v. State*, 708 So. 2d 1358, 1362-63 (Miss. 1998))).

¶39. Even so, we find the evidence against Williams was certainly sufficient to support a sexual-battery conviction. Williams was convicted of violating Section 97-3-95(1)(c). Under this subsection, a person is guilty of sexual battery if he engages in sexual penetration

---

[2] While Presiding Justice King makes broad policy arguments concerning appointed counsel, here, Williams's appellate attorney was privately hired.

with a child at least fourteen but under sixteen years of age if the person is thirty-six or more months older than the child. Miss. Code Ann. § 97-3-95(1)(c). Lack of consent is not an essential element of sexual battery under Section 97-3-95(1)(c). JR testified Williams engaged in sexual penetration with her when she was fourteen and he was twenty-two. And text messages from Williams's 2190 number to JR corroborate that Williams had sex with the minor. Though Williams denied being at JR's apartment that night and later sending JR the text messages, the State rebutted this testimony with evidence that Williams's ankle monitor showed he was there. So Williams's sufficiency-of-the-evidence claim lacks merit.

**Conclusion**

¶40. Because Williams's conviction was sufficiently supported by the evidence and was not the result of any erroneous and prejudicial evidentiary rulings, we affirm.

¶41. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND ISHEE, J.; COLEMAN, J., JOINS IN PART.**

**KING, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶42. While I agree with the result reached by the majority, I write separately to express my concern with its pronouncement that this Court has no obligation to address Williams's sufficiency of the evidence claim.

¶43. The majority opines that it has no obligation to consider Williams's sufficiency of the evidence claim because the cases he cites have different facts than does his case; thus, the majority deems these cases irrelevant. I write on this issue separately to express my

disagreement with both the Court's treatment of failure to cite authority as a seemingly automatic procedural bar and the Court's continued declarations that allegedly insufficient citation of authority operates as a procedural bar, particularly when the Court has no clear standards alerting litigants what authority is sufficient to prevent a procedural bar.

¶44.     "The authority is clear that treating failure to cite authority as a procedural bar is permissive, not mandatory." *Cork v. State*, 329 So. 3d 1183, 1193 (Miss. 2021) (King, P.J., dissenting) (citing *McLain v. State*, 625 So. 2d 774, 781 (Miss. 1993); *Barbetta v. State*, 738 So. 2d 258, 261 (Miss. Ct. App. 1999) (King., J., concurring)).  Moreover,

> The general rule that questions assigned as error are waived in the appellate court by certain acts or omissions is not, in the light of its purpose, inflexible, and its application generally lies within the discretion of the court. . . .
>
> The reviewing court will be inclined to consider errors which were not sufficiently briefed or argued, where the interests of justice warrant it, that is, to prevent a miscarriage of justice.

5 C.J.S. *Appeal and Error* § 993 (footnotes omitted) (citations omitted).

> By using this procedural bar liberally and without considering its discretion to apply it, this Court overlooks multiple problems with using failure to cite authority as an automatic procedural bar.  First, the Court's extensive use of the procedural bar without considering its discretion hinders a party's ability to argue a novel legal theory.  Second, it ignores that every factual situation is nuanced and unique and may not find equivalent support in caselaw.  This is especially true for criminal defendants in Mississippi, whose very liberty is at stake, and against whom this Court seems to grow increasingly hostile.  For example, in 2020, this Court decided thirty-one criminal appeals on the merits.  Supreme Court of Mississippi 2020 Annual Report, https://courts.ms.gov/research/reports/SCTAnnRep2020.pdf (last visited Nov. 29, 2021).  Of those cases, this Court reversed only three, or a mere 9.7 percent.  *Id.*  And because the State is generally prohibited from prosecuting appeals in criminal cases, the overwhelming majority of criminal appellants consist of the criminal defendant.  *See* Miss. Code Ann. § 99-35-103 (Rev. 2020); *State v. Hicks*, 806 So. 2d 261, 263 (Miss. 2002).  In

16

contrast, this Court is more receptive to civil appellants, as it decided 103 civil appeals on the merits in 2020 and reversed, vacated, or remanded forty-four, or 42.7 percent, of the civil appeals. *Id.* Thus, it is likely more difficult for criminal defendants to find factual support in authority for their arguments; this should not bar them from having those arguments considered by this Court.

*Cork*, 329 So. 3d at 1193-94.

¶45. "This is especially true given this Court's problematic holdings that criminal defendants[,]" like Williams, "who cite authority, but do not cite authority regarding their specific factual situations, are also procedurally barred from raising those issues for a failure to cite authority." *Id.* at 1194 (citing *Glasper v. State*, 914 So. 2d 708, 726 (Miss. 2005) ("We first note that while Glasper refers us to *Strickland* [*v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] and various decisions from this Court for the appropriate criteria we are to consider in reviewing claims of ineffective assistance of counsel, Glasper has wholly failed to cite to us a single case to support his specific claims of ineffectiveness of his trial counsel by allegedly failing to file critical motions, failing to invoke the adversarial process, and failing to investigate. Our cases are legion where we have stated that the failure to cite authority in support of an argument eliminates our obligation to review the issue.")). This Court has not espoused any standards for when the "wrong" authority cited operates as a procedural bar, leaving litigants unaware as to when actually citing authority for an argument may nonetheless lead to a procedural bar. Instead, the Court appears to rely on its vague and subjective opinion regarding whether the authority cited is sufficient to withstand a procedural bar. Mississippi Rule of Appellate Procedure 28 provides that an argument in a brief "shall contain the contentions of appellant with respect

to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." M.R.A.P. 28(a)(7). When the Court finds those authorities unpersuasive, such opinion should apply to whether the Court accepts or rejects the merits of the argument, not operate as a procedural bar to considering the argument.

> Third, while this Court should certainly hold litigants to certain standards, liberally applying this procedural bar in criminal cases fails to account for the fact that the public defender network in Mississippi, including the Office of Indigent Appeals, is insufficiently supported and lacks resources. *See* ***Henderson v. State***, 323 So. 3d 1020, 1034 (Miss. 2021) (King, P.J., concurring in part and dissenting in part) ("Problems with Mississippi's public defender network, including excessive caseloads for attorneys, have been well documented."). Moreover, criminal defendants often file pro se briefs, and in doing so, their resources are minimal. The combination of fewer favorable cases to cite and fewer resources to locate any such cases creates a perfect storm for criminal defendants, and this Court should be mindful of such problems before automatically applying a discretionary procedural bar for failure to cite authority.

***Cork***, 329 So. 3d at 1194.

¶46. Consequently, I disagree with this Court's treatment of failure to cite authority as an automatic procedural bar. Furthermore, I am troubled by the Court's treatment of citing authority that it subjectively deems insufficient as a procedural bar. Citation of authority that the Court opines is unpersuasive for any reason should go to the merits and weight of the argument, not operate as a procedural bar. At the least, this Court should provide litigants an objective standard for when it will consider citation of authority so insufficient that the procedural bar is applicable.

**KITCHENS, P.J., AND ISHEE, J., JOIN THIS OPINION. COLEMAN, J., JOINS THIS OPINION IN PART.**

18