# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01090-COA

**VICTOR L. MCBEATH A/K/A VICTOR MCBEATH**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/11/2017 |
| TRIAL JUDGE: | HON. CHRISTOPHER A. COLLINS |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/13/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., WILSON AND WESTBROOKS, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.    Following a jury trial in the Neshoba County Circuit Court, Victor McBeath was convicted of first-degree murder and first-degree arson. On appeal, McBeath argues that his trial counsel provided ineffective assistance by failing to investigate or present an insanity defense and by failing to object to certain opinion testimony from law enforcement officers. We conclude that the present record is insufficient to address McBeath's claim. Therefore, we dismiss the claim without prejudice. McBeath may assert the claim in a properly filed motion for post-conviction relief. McBeath's convictions and sentences are affirmed.

## FACTS AND PROCEDURAL HISTORY

¶2.     On the evening of November 25, 2015, McBeath and his brother Demonta were "chilling" with some friends at a house in Walnut Grove. Between 9 and 10 p.m., McBeath drove back to his father's house in Neshoba County, where he and Demonta lived. Fifteen to thirty minutes later, Demonta did the same. When Demonta arrived home, McBeath was on the couch in the living room, where he usually slept. Demonta testified that McBeath was "acting delusional, psychotic, and he was talking out of his head." Demonta briefly talked to McBeath and then went to his bedroom, locked his door, and went to sleep. Demonta testified that when he went to bed, McBeath was still pacing in the living room and talking to himself. Their father, Ozie, was already asleep in his bedroom.

¶3.     Around 3:30 or 4 a.m., Demonta awoke to a gunshot and a scream. He jumped out of bed and ran into the hallway. He then saw McBeath walking toward him with a shotgun. McBeath did not say anything at first, but he seemed "angry"—"[h]is eyes were bulged and he seemed dysfunctional." Demonta testified that McBeath then said to "get the baby," although there was no baby in the house. When McBeath pointed the gun at him, Demonta "tried to make a run for it." He knocked over a dresser, broke out a window, and tried to climb out. But McBeath still had the gun pointed at him. Demonta begged McBeath not to shoot him. When McBeath paused briefly, Demonta charged at him, knocked him down, and took the gun. Demonta asked McBeath what he had done, and McBeath said, "Monta, I'm sorry."

¶4.     Demonta, now holding the shotgun, ran to Ozie's bedroom. He saw blood on a pillow

but did not see Ozie, so he began searching other rooms. While Demonta looked for Ozie, McBeath found a rifle. Demonta and McBeath ran into each other outside Ozie's bedroom. Demonta hit McBeath with his shotgun, and a fight ensued. Demonta was able to take the rifle from McBeath, and he then continued his search for Ozie. Demonta finally found Ozie on a daybed in the living room. Ozie had been shot in the back of the head and appeared to be dead. Demonta then used a padlock to lock the shotgun and rifle in a bedroom, and he left the house in Ozie's Chevy Tahoe. As Demonta drove away, McBeath was pacing in the yard and still "talking out of his head."

¶5.    Neshoba County deputy sheriffs Colby Clay and Greg Tubby went to the house to investigate. Clay knew McBeath because he had been called to the house several times on "disturbance calls" involving McBeath and Ozie. Clay and Tubby initially knocked on the door and waited, but after they saw fire coming out of a window, they kicked open the front door and entered the house. Once inside, they saw Ozie on the daybed. They tried to look for others, but there was too much smoke, so Tubby retrieved a fire extinguisher from their car and used it to put out the fire. Clay found a space heater in the dining room near the spot where the fire appeared to have started. Clay testified that he did not smell any accelerants at the time.

¶6.    Clay and Tubby then moved to the backyard. There was a tree line fifty feet or so behind the house, and Clay shined his flashlight into the trees and called, "Victor, come out." After he called two or three times, McBeath responded, "Mr. Clay, I'm coming out." McBeath then came out of the trees, and Clay handcuffed and arrested him. Clay testified

3

that McBeath's "demeanor was a bit spacey." McBeath was responsive as long as Clay could keep "his attention," but he was also "mumbling" to himself incoherently. Clay testified that McBeath "was acting different" that night than during their prior encounters, but Clay did not smell any alcohol on McBeath. Clay said it was "possible" that McBeath was under the influence of drugs.

¶7. Investigator Ralph Sciple determined that Ozie was shot in his bedroom while still lying down in his bed and then dragged through the house to the daybed. Sciple found the rifle and shotgun, a Winchester, in a locked bedroom and a pistol under Ozie's pillow. Sciple, who was also the arson investigator for Neshoba County, examined the dining room and the space heater and determined that the fire was set intentionally because "[t]here was nothing else there that would . . . set it on fire." He testified that the space heater was not turned on at the time of the fire, so it could not have caused the fire.

¶8. Sciple was unable to interview McBeath at the time of his arrest because he seemed to be "under the influence of something." However, Sciple and Sheriff Tommy Waddell interviewed McBeath in jail a few days later. McBeath waived his *Miranda* rights and agreed to talk to Sciple and Waddell without an attorney.[1] Sciple testified that McBeath did not appear to be under the influence of drugs or alcohol at the time of the interview. McBeath told Sciple and Waddell that he could not remember much about killing Ozie.

---

[1] During trial, McBeath made an ore tenus motion to suppress his oral statements to Sciple and Waddell. The court held a suppression hearing outside the presence of the jury, and both Sciple and Waddell testified. McBeath did not testify. The trial judge then denied McBeath's motion, finding that his *Miranda* waiver was valid and that his statement was free and voluntary. McBeath does not raise this issue on appeal.

4

McBeath said repeatedly that he was "on some bad dope and went crazy." He told Sciple that the "bad dope" was methamphetamine.

¶9.    McBeath told Sciple that he remembered shooting Ozie, but he did not know why he did it. He said that he moved Ozie to the living room to try to get help. McBeath also admitted that he started the fire, but he said he could not remember what he used to start it. The interview was not recorded, and McBeath declined to make a written statement.

¶10.    McBeath was indicted for first-degree murder and first-degree arson. His attorney, James E. Smith III, filed a motion for a psychiatric evaluation to determine his competence to stand trial. In his motion, Smith stated that he believed that McBeath was mentally ill and unable to assist in his own defense. The court ordered an evaluation and directed the psychiatrist to assess McBeath's present ability to assist in his own defense and competence to stand trial. The court's order also directed the psychiatrist to assess McBeath's ability to know the difference between right and wrong at the time of the offense.

¶11.    Dr. Mark Webb evaluated McBeath. In his report, Webb noted that McBeath denied killing Ozie and claimed that "they have the wrong person." McBeath told Webb that he had "fired [Smith]" and wanted a new attorney because Smith "was not listening to [him]." Webb noted that McBeath had no history of mental illness and was not taking any medications, although he claimed to have smoked "a lot of marijuana" prior to his arrest. Webb described McBeath as "cooperative, logical and coherent, [and] fairly cheerful." McBeath told Webb that he had not experienced any hallucinations, delusions, or manic episodes. Webb found that McBeath's insight, judgment, memory, and concentration were

5

all "good." Webb further noted that "McBeath laugh[ed] and joke[d] a good bit during the interview," and McBeath was adamant that he was "not crazy." Webb's only diagnosis was "Alcohol and Marijuana Use Disorder," which he based on McBeath's own descriptions of his alcohol and drug use. Webb concluded, "McBeath is competent to stand trial and is not criminally insane."

¶12. At a subsequent hearing, Webb reaffirmed the substance and conclusions of his report. Webb testified that McBeath understood his legal situation and the charges against him. Indeed, Webb testified that McBeath was "actually a fairly intelligent person" with no history of mental health issues. Webb testified that McBeath was competent to stand trial. He also testified that there was no evidence of any *M'Naghten*[2] issue and that McBeath had no mental health issues other than alcohol and marijuana use. Webb testified that he found "no reason to suggest that [McBeath] was insane at the time of the [offense]." He found McBeath to be "stone cold psychiatrically normal, except for his history of alcohol and drug abuse."

¶13. McBeath did not testify or call any witnesses at his competency hearing. At the end of the hearing, the trial judge ruled that McBeath was competent to stand trial.

¶14. Smith also filed a pretrial motion to withdraw as McBeath's counsel on the ground that McBeath had refused to cooperate or discuss the facts of the case. According to Smith's

---

[2] "Mississippi follows the *M'Naghten* test for determining whether a person was sane at the time of the crime. Under the *M'Naghten* test, the accused must be laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong. In sum, the accused must not have known right from wrong at the time of the offense." *Hearn v. State*, 3 So. 3d 722, 738 (¶46) (Miss. 2008) (citations and quotation marks omitted).

motion, McBeath also claimed during one meeting that Sheriff Waddell had "stolen his mind." The circuit court held a hearing on Smith's motion to withdraw on the same day as McBeath's competency hearing. Two lawyers testified. Both had accompanied Smith to meet with McBeath and corroborated the substance of Smith's motion. One confirmed that McBeath had said something to the effect that the sheriff had stolen his mind.[3] McBeath declined to testify during the hearing on Smith's motion to withdraw. At the conclusion of the hearing, the trial judge found—based on Dr. Webb's report and testimony—that McBeath clearly had the ability to cooperate with counsel. The judge then admonished McBeath to start cooperating with Smith, and he denied Smith's motion to withdraw.

¶15.    McBeath's case proceeded to trial on July 5-6, 2017. Demonta, Clay, Sciple, and three expert witnesses testified in the State's case-in-chief. Expert testimony established, among other things, that Ozie's DNA was on the shirt that McBeath wore on the night of the murder; that shotgun hulls found in Ozie's bedroom matched the Winchester shotgun; that Ozie died from a single shot to the back of the head; and that the shotgun was in direct contact with Ozie's head when it was fired. After the State rested, McBeath declined to testify and rested without calling any witnesses. The jury found McBeath guilty of first-degree murder and first-degree arson. The court sentenced McBeath to life imprisonment for murder and twenty years in the custody of the Department of Corrections for arson, with the sentences to run consecutively. McBeath filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a timely notice of appeal.

---

[3] Dr. Webb testified that McBeath did not make any such claim when they met.

**ANALYSIS**

¶16.    On appeal, McBeath asserts that his trial counsel provided ineffective assistance by "failing to raise an insanity defense and/or present an insanity defense instruction" and by failing to interview witnesses to "investigate" a potential insanity defense. McBeath also argues that trial counsel was ineffective because he "fail[ed] to object to speculative opinion testimony by police officers." We address these issues in turn below.

¶17.    "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on such a claim, the defendant must show *both* (1) "that counsel's performance was deficient"—i.e., "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"—*and* (2) that he was prejudiced as a result—i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Stated differently, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "If either prong [of the *Strickland* test] is not met, the claim fails." *Havard v. State*, 928 So. 2d 771, 781 (¶8) (Miss. 2006).

¶18.    Ordinarily, a claim of ineffective assistance should be raised in a motion for post-conviction relief, not on direct appeal. We have explained that

[i]t is unusual for this Court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal because there is usually insufficient evidence within the record to evaluate the claim. Because an appellate court is limited to the trial record on direct appeal, issues of ineffective assistance of counsel are more appropriate in a motion for post-conviction relief. We may address such claims on direct appeal only if (a) the issues are based on facts fully apparent from the record or (b) the parties stipulate that the record is adequate, and we determine that additional findings of fact by a trial judge are not needed. If the record is not sufficient to address the claims on direct appeal, we dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief.

*Shinn v. State*, 174 So. 3d 961, 965 (¶11) (Miss. Ct. App. 2015) (citations, quotation marks, and alterations omitted); *see also Taylor v. State*, 167 So. 3d 1143, 1146 (¶5) (Miss. 2015) ("While post-conviction proceedings are often the most appropriate forum for review of ineffective assistance of counsel, we may nevertheless reach the merits of the ineffectiveness issue where the record affirmatively shows ineffectiveness of constitutional dimensions." (alterations and quotation marks omitted)).

## I.     Insanity Defense

¶19.    As noted above, McBeath claims that his trial counsel was ineffective because he failed to pursue an insanity defense and failed to offer a jury instruction on the defense. Under this heading, McBeath also asserts that his trial counsel was ineffective because he "fail[ed] to investigate" a potential insanity defense. However, the State does not "stipulate that the record is adequate" to address this claim. Nor is a constitutional violation apparent from the face of the record. Therefore, we hold that McBeath's claim cannot be decided on direct appeal. The claim must be addressed, if at all, in a motion for post-conviction relief.

¶20.    To begin with, although McBeath did not testify, the record suggests that he did not

9

*want* to pursue an insanity defense. McBeath made clear to Dr. Webb that he was "not crazy," and he complained that his lawyer "was not listening to" his claim that he was innocent. As discussed above, Webb and the trial judge both concluded that McBeath was competent to stand trial, and the judge's ruling has not been challenged on appeal. Competence to stand trial and sanity at the time of the offense are distinct issues. But it is unclear that an attorney *can* assert an insanity defense without his client's consent. This appears to be an open issue in Mississippi, but most jurisdictions hold that defense counsel may not assert an insanity defense over the objection of a competent defendant. *See, e.g.*, *McLaren v. State*, 407 P.3d 1200, 1212 (Wyo. 2017) (collecting cases). We need not and do not address that legal issue in this case. Rather, we simply note that the record in this appeal does not even show that McBeath was willing to assert an insanity defense. In fact, the record suggests that he was opposed to it.

¶21. More important, the record on appeal does not establish any reasonable probability that the jury would have found McBeath not guilty by reason of insanity. As discussed above, the trial judge specifically directed Dr. Webb to evaluate McBeath's sanity "at the time of the alleged offense." Webb subsequently testified that he found no evidence of psychosis or any other possible *M'Naghten* issues. Webb noted that McBeath had no history of mental illness and was not taking any medications at the time of the offense. McBeath told Webb that "[h]e was smoking a lot of marijuana and drinking prior to his arrest." But Webb testified that those are "intoxication issues and not psychosis or things like that." Webb's testimony is consistent with the law in this State, as well as the jury instructions

10

given in this case. "[V]oluntary intoxication is not a defense to a specific intent crime, such as murder." *Lanier v. State*, 533 So. 2d 473, 478 (Miss. 1988). "An amplified restatement of the rule is: a defendant, capable of distinguishing between right and wrong when sober, is not entitled to an instruction submitting to the jury his inability to form the specific intent to commit an offense because of his voluntary intoxication at the time the offense was committed." *Lee v. State*, 403 So. 2d 132, 134 (Miss. 1981).

¶22. On appeal, McBeath ignores Dr. Webb's uncontradicted testimony that there was no evidence of psychosis or any other *M'Naghten* issue in this case. Instead, McBeath cites Demonta's testimony that he was "acting delusional, psychotic, and he was talking out of his head." McBeath also relies on Demonta's hearsay testimony about a prior incident when their sister allegedly "tried to tell [police] that [McBeath] was psychotic." McBeath also cites Clay's testimony that he was "spacey" and mumbling incoherently at the time of his arrest. Finally, McBeath relies on trial counsel's concerns about his ability to assist in his own defense and his bizarre statements about the sheriff stealing his mind. Relying on this lay testimony, McBeath's appellate counsel asserts that "[p]roper preparation" by trial counsel could have established that McBeath killed Ozie because of "a severe psychotic episode."

¶23. However, most of the lay testimony that McBeath cites on appeal is consistent with Dr. Webb's conclusion that McBeath was sane at the time of the offense and was not suffering from psychosis or any other mental illness. Moreover, there is no evidence in the record to show that McBeath's unusual behavior was caused by a mental illness, much less

11

a mental illness that would satisfy the *M'Naghten* test. That is, there is nothing to show that McBeath was incapable of distinguishing "right from wrong at the time of the offense." *Hearn*, 3 So. 3d at 738 (¶46). Given Dr. Webb's uncontradicted testimony that McBeath was sane and not suffering from any mental illness at the time of the offense, there is no "reasonable probability" that a jury would have found McBeath not guilty by reason of insanity. *Strickland*, 466 U.S. at 694. Therefore, based on the evidence in the record on appeal, McBeath cannot establish "prejudice" under the second prong of the *Strickland* test. *Id.*; *see Epps v. State*, 984 So. 2d 1042, 1048-50 (¶¶22-27) (Miss. Ct. App. 2008) (holding that the defendant was not prejudiced by his attorneys' failure to pursue an insanity defense because "[h]e could not fulfill the requirements of *M'Naghten*"). Because McBeath cannot satisfy *Strickland*'s second prong on the present record, it follows that he cannot prevail on his ineffective assistance claim in this appeal. *Havard*, 928 So. 2d at 781 (¶8).[4]

¶24. Rather than reject McBeath's ineffective assistance claim on the merits, we follow our usual practice and dismiss the claim without prejudice. As discussed above, we ordinarily decline to consider ineffective assistance claims on direct appeal. *See Shinn*, 174 So. 3d at 965 (¶11). In this appeal, McBeath argues in part that his counsel failed to interview witnesses to investigate a possible insanity defense. By its nature, such a failure-to-investigate claim cannot be evaluated on direct appeal because it alleges that counsel failed to discover evidence that is not in the record. *See Page v. State*, 987 So. 2d 1035, 1037-38

---

[4] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

12

(¶¶7-12) (Miss. Ct. App. 2008).  The mere fact that an insanity defense was not asserted does not mean that defense counsel did not investigate the issue.  *Id.* at 1038 (¶11).  "[D]efense counsel could have investigated [McBeath's] mental state and been unable to glean any useful evidence for [McBeath's] defense."  *Id.*

¶25.   Moreover, McBeath's appellate counsel effectively concedes that his claim needs some support from outside the present record.  In a footnote, appellate counsel states that his assertion that McBeath experienced a psychotic episode is based on his own review of "several medical sources" (i.e., websites) that do not appear in the record.  The present record contains no such support for McBeath's allegation that he suffered from a mental illness at the time of the offense.  *See id.* (declining to address a claim of ineffective assistance based on counsel's failure to pursue an insanity defense because the claim relied on a publication that did "not appear in the record").  Finally, as noted above, the State specifically declines to stipulate that the record on appeal is adequate to permit consideration of McBeath's claim.  Accordingly, we dismiss McBeath's ineffective assistance claim without prejudice to his right to assert such a claim in a properly filed motion for post-conviction relief.[5]

## II.    Failure to Object

¶26.   McBeath also complains on appeal that trial counsel failed to object to "speculative opinion testimony" by law enforcement officers.  He refers to three such opinions.  First, Clay testified that although McBeath did not appear to be under the influence of alcohol at the time of his arrest, it was "possible" that he was under the influence of drugs.  Second,

---

[5] McBeath may not file such a motion in the circuit court unless he obtains permission from the Mississippi Supreme Court.  *See* Miss. Code Ann. § 99-39-7 (Rev. 2015).

13

Sciple testified that the fire in the house was set intentionally because "[t]here was nothing else [where the fire started] that would . . . set it on fire." Sciple explained that the space heater was not turned on, so it could not have started the fire. Third, Sciple testified when McBeath told him he had taken some "bad dope" (methamphetamine), he understood McBeath to mean that he "had mixed meth with some other kind of chemical that he wasn't used to."

¶27. McBeath devotes less than a page to this issue. He fails to develop any argument or cite any authority to show that a timely objection to the testimony at issue would have been sustained. That is, he simply asserts, without support, that the testimony was objectionable. We could hold that the issue is waived for that reason. *See Randolph v. State*, 852 So. 2d 547, 558 (¶29) (Miss. 2002).

¶28. Instead, because the issue is related to McBeath's claim that trial counsel should have investigated and asserted an insanity defense, we also dismiss this claim without prejudice. McBeath may raise this allegation of ineffective assistance in a properly filed motion for post-conviction relief.

## CONCLUSION

¶29. McBeath's convictions and sentences are affirmed. His allegation that trial counsel provided ineffective assistance of counsel is dismissed without prejudice.

¶30. **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., BARNES, CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**